2000 D.S.D. 39.

**NADER 2000 PRIMARY COMMITTEE, INC., Ralph Nader, Winona Laduke, Catherine Enyeart, and Mark Dunlea, Plaintiffs,**

v.

**Joyce HAZELTINE, in her official capacity as Secretary of State of South Dakota, Defendant.**

**No. CIV. 00–3032.**

United States District Court, D. South Dakota, Central Division.

Aug. 29, 2000.

Elizabeth Daniel, Brennan Center for Justice, New York University School of Law, New York City, Patrick K. Duffy, Rapid City, SD, for Plaintiffs.

Sherri Sundem Wald, Attorney General's Office, Pierre, SD, for Defendants.

## MEMORANDUM OPINION AND ORDER

KORNMANN, District Judge.

[¶ 1] Presidential candidate Ralph Nader and his supporters ("Nader") challenge the constitutionality of a portion of an amended South Dakota statute, the challenge being limited to its application to candidates for President of the United States. Nader asks this court to order the defendant South Dakota Secretary of State, Joyce Hazeltine ("Hazeltine"), to place his name (or more correctly, his three electors) on the general election ballot in South Dakota. Nader announced his intention to seek the office on February 21, 2000. He accepted the nomination of the Green Party on June 25, 2000. On April 21, 2000, Nader signed the "independent candidate for president declaration of candidate and certification of running mate." On May 3, 2000, Nader's running mate, Winona LaDuke, signed the South Dakota form as a vice-presidential candidate. Both forms were filed in Hazeltine's office on May 11. The three proposed electors for Nader signed a declaration of candidacy on May 18.

[¶ 2] The statute in question is SDCL 12–7–1. For 23 years, South Dakota allowed independent presidential candidates to file their petitions for ballot access on the first Tuesday in August. In the 1999 session of the South Dakota Legislature, Senate Bill 34 ("SB 34") was introduced at the request of the State Board of Elections. As drafted and introduced, the bill proposed no change in the filing date for independent candidates. The title of the bill was: "An Act to revise certain requirements concerning the certificate for nomination and to provide certain rule-making authority." The bill was referred to the Senate Committee on Local Government (although the bill obviously dealt with matters of statewide significance, including presidential

candidates). The committee amended the bill in two places to change the filing date. The amendment overstruck "first Tuesday in August" and inserted "third Tuesday in June." There is no evidence that this change in the filing date was requested by Hazeltine, by her employee, Chris Nelson (the State Election Director), or by the State Board of Elections. There is no evidence that the filing date, namely the first Tuesday in August, had been, over the course of 23 years, causing any difficulties for state or county election officials or for the voters of South Dakota. Despite the very significant change in the impacts of the bill, the title to the bill was not amended. The bill, with apparent broad support from Republicans and Democrats, proceeded, with only three negative votes, through the South Dakota Legislature, was signed by the Governor and became law effective July 1, 1999. Thus, in 2000, the filing deadline became June 20.

[¶ 3] Of some interest is the fact that House Bill 1231 was introduced in the 2000 session of the South Dakota Legislature, sponsored by Representative Volesky, Senator Staggers and others. The title expressed exactly what the bill proposed to do: "An Act to extend the time for independent presidential candidates to file nominating petitions." The bill would have, as to independent presidential candidates only, changed the petition filing deadline back to the first Tuesday in August. The bill died in committee.

[¶ 4] Thirty three states have filing deadlines for presidential candidates in August or later. South Dakota's new deadline became the third earliest in the United States and South Dakota is one of four states with a deadline earlier than July 1. The June 20 deadline for independent presidential candidates in South Dakota obviously presents much greater difficulties than are presented to the candidates of the two major parties. Republican candidates were not nominated until the national convention which ended on August 3. Democratic candidates were not nomi-nated until the national convention which ended on August 17.

[¶ 5] The present case was filed on July 31, 2000. Nader moved for a preliminary injunction on August 2. The answer was filed and the case was at issue on August 15. The court has dealt with the extensive filings made by presidential candidate John Hagelin and his supporters and their attempt to intervene in this lawsuit which attempt has been opposed by Hazeltine. Such attempts have been rejected by an order entered August 28 (Doc.21), denying the Hagelin motion to intervene. Oral argument was then scheduled on an emergency basis and was conducted on August 28. There is great urgency in this matter since Hazeltine is, pursuant to SDCL 12–8–8, required, unless enjoined by this court, to certify to each county auditor in South Dakota the names of the candidates to be placed on the general election ballot and the deadline for this is August 29, today's date. Any judge would prefer more time to conduct research, to go through drafts and a number of re-drafts of an opinion, and to write an opinion with detailed citations to principles of law. These options are not altogether available and certain principles of law will necessarily be stated without citation to supporting cases.

[¶ 6] In considering whether to grant a preliminary injunction, the court is required to consider the four well known factors expressed in *Dataphase Systems, Inc. v. C.L. Systems, Inc.,* 640 F.2d 109 (8th Cir.1981). The factors are the question of the probability of the success on the merits, the threat of irreparable harm to the movant, the balance between such harm and the injury that granting the injunction will inflict on other interested parties, and whether the issuance of an injunction is in the public interest. The court is directed to consider the equities since "no single factor is determinative." *Id.* at 113. The court finds there is no possible harm to Hazeltine if the injunction is granted promptly. There is the threat

of irreparable harm to Nader if the injunction is not granted since he and his supporters will be denied access to the general election ballot. The record is clear that such denial would result in financial consequences (less federal funding for his national campaign) to Nader. These two factors are easily found.

[¶ 7] Pursuant to SDCL 12–7–1, Nader's electors could not be placed on the general election ballot without first obtaining the signatures of at least a number of registered voters to equal one per cent of the total votes cast for Governor in the previous gubernatorial election. The required number of valid signatures is 2,602. The record is clear and undisputed that Nader did not achieve this by June 20, even with the petitions mailed on that date (which would meet the deadline of June 20). Thus, if the amendment to SDCL 12–7–1 changing the filing date is constitutional, there is nothing further to decide. It would make no difference what Nader did or did not do after June 20. In deciding whether Nader had the requisite number of signatures by June 20, this court counts as valid signatures those signatures obtained by circulators who may not have been registered voters in South Dakota. This is despite the fact that SDCL 12–1–3, until July 1, 2000, required circulators to be registered voters. Such requirement became a nullity with the decision of the United States Supreme Court holding that states may not require petition circulators to be registered voters. *See Buckley v. American Const. Law Foundation,* 525 U.S. 182, 119 S.Ct. 636, 142 L.Ed.2d 599 (1999). South Dakota should have immediately complied with the directive of the highest court in this country rather than waiting for the formal repeal of the unconstitutional portion of the state statute. Nader's campaign workers should not have been advised that only South Dakota registered voters could circulate nominating petitions. On the other hand, it is perhaps expecting too much that state officials would ignore state law, even though obviously unconstitutional. Nader, in any

event, had no right to blindly accept such clearly erroneous advice. He could and should have had non-registered voters circulate petitions, present them to the Secretary of State, and, when rejected, file a challenge in court. Obviously, any court, whether state or federal, would follow the dictates of the United States Supreme Court. This court will not now speculate as to what might have been done or could have been done.

[¶ 8] This court, *sua sponte,* raised the question whether the title to SB 34 was in violation of Article III, § 21, of the South Dakota Constitution, which provides: "No law shall embrace more than one subject, which shall be expressed in its title." Under the teaching of *South Dakota Physician's Health Group v. State by and through Dept. of Health,* 447 N.W.2d 511, 513 (S.D.1989), the constitutional provision is designed "to prevent the unintentional and unknowing passage of provisions inserted in a bill of which the title gives no intimation; and, * * * to fairly apprise the public of matters which are contained in the various bills and to prevent fraud or deception of the public as to matters being considered by the legislature." (citing cases) While the title to SB 34 made no reference to the statute being amended, this is not something that, by itself, renders the title defective. Reference to the original act or statute may be helpful and may be considered by the court in determining whether the title is defective. *Id.* at 514. While this court would be inclined to hold the title to SB 34, as the bill was so dramatically amended, to violate the South Dakota Constitution, there is no need to address the matter since the statute was, in 2000, reenacted as part of the South Dakota Codified Laws and is no longer subject to attack because of a claimed defect in the title to the original Act. *See State v. Matteson,* 87 S.D. 216, 205 N.W.2d 512, 513 (S.D.1973), and *Miles Laboratories v. Owl Drug Co.,* 67 S.D. 523, 295 N.W. 292 (1940).

**[¶ 9]** It is a well known principle of law that a court, in general, should not decide constitutional issues if the case may properly be decided on other grounds. The question of striking down a statute must be approached with great caution and even reluctance. Statutes are to be presumed to be constitutional unless they so clearly conflict with the constitution as to leave no reasonable doubt as to the defective nature of the statute. All courts should approach constitutional issues with great respect for popularly elected officials, particularly members of the legislative branch. A court should inquire into the constitutionality of a statute only if such inquiry is essential to the protection of the rights of one of the parties, in this case Nader. There is no doubt that a substantial actual controversy exists here. There is no doubt that a decision in this case may have national implications, especially for Nader who is involved in litigation in other states involving similar issues to those presented here. The question of whether Nader's rights have been violated is not hypothetical, abstract, or in the nature of an academic dissertation. It is a ripe controversy in every sense. Hazeltine argues, and with considerable persuasiveness, that the case may be disposed of based upon Nader's failure to obtain sufficient valid signatures, even to the present day. The problem with this approach is that there would be no reason to inquire as to what transpired after June 20 if the statute is indeed constitutional. That would be the end of the inquiry. This court exercises its discretion to pass on important federal constitutional issues in this case which issues are very important to Nader and perhaps to others.

**[¶ 10]** *Anderson v. Celebrezze,* 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983), is directly on point here. In 1980, John Anderson became an independent candidate for President. He challenged Ohio's statute that required an independent candidate to file a statement of candidacy and petitions by March 20 in order to appear on the November general election ballot.

Anderson prevailed in the District Court, lost in the Court of Appeals and prevailed in the United States Supreme Court. The case was decided although the 1980 election was over. Now Chief Justice Rehnquist, joined by Justices Powell and O'Connor and then Justice White, dissented and Justice Rehnquist wrote: "The Court's opinion draws no line; I presume that a State must wait until all party nominees are chosen and then allow all unsuccessful party candidates to refight their party battles by forming an 'independent' candidacy."

**[¶ 11]** I will discuss important language from *Anderson,* including some quotes from earlier cases, but without citations to page numbers or such earlier cases, stating again that the court simply does not have the luxury of time. The question decided in *Anderson* was "whether Ohio's early filing deadline placed an unconstitutional burden on the voting and associational rights of Anderson's supporters." State laws of this type place burdens "on two different, although overlapping, kinds of rights—the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively. Both of these rights, of course, rank among our most precious freedoms."

**[¶ 12]** Exclusion of candidates "also burdens voters' freedom of association, because an election campaign is an effective platform for the expression of views on the issues of the day, and a candidate serves as a rallying-point for like-minded citizens."

**[¶ 13]** It is important to note that not all State restrictions on candidate eligibility for ballot access are suspect from a constitutional standpoint. There must, of course, be substantial regulations of elections and the nominating process. Nominations and elections should proceed with order and not with chaos. Such regu-

lations, however, must be logical, reasonable and necessary.

[¶ 14] A court "must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff (here Nader) seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule." As already noted, South Dakota has presented no precise or, for that matter, imprecise interests to justify changing the filing date from the first Tuesday in August to the third Tuesday in June. Nor can this court conceive of any such claimed interest. There is no such interest which would be valid or permissible. Hazeltine and the Attorney General's office have an obligation to advance no specious arguments to this court. While they have an obligation to defend what the legislature has done, they must be honest and forthright in doing so. They have met that responsibility. They are placed "in the middle" when a law is changed that is not requested by them. Thus, unlike the case in *Anderson* where Ohio advanced a number of reasons for the early deadline, all of which were rejected by the Supreme Court, no reasons are here advanced. Thus, there is nothing for the court, in passing judgment, to examine to "determine the legitimacy and strength of each of those interests." The court is to determine "the extent to which those interests make it necessary to burden the plaintiff's rights." "Only after weighting all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional." Here, Nader is heavily burdened with no good or valid reason for South Dakota to do so.

[¶ 15] "An early filing deadline may have a substantial impact on independent-minded voters. In election campaigns, particularly those which are national in scope, the candidates and the issues simply do not remain static over time. Various candidates rise and fall in popularity; domestic and international developments bring new issues to center stage * * *. Such developments will certainly affect the strategies of candidates who have already entered the race; they may also create opportunities for new candidacies." "Since the principal policies of the major parties change to some extent from year to year, and since the identity of the likely major party nominees may not be known until shortly before the election, this disaffected 'group' will rarely if ever be a cohesive or identifiable group until a few months before the election."

[¶ 16] The inquiry must be whether the challenged restriction "unfairly or unnecessarily burdens 'the availability of political opportunity.'" As to Nader, the restriction is both unfair and unnecessary. "A burden that falls unequally on new or small political parties or on independent candidates impinges, by its very nature, on associational choices protected by the First Amendment. It discriminates against those candidates and—of particular importance—against those voters whose political preferences lie outside the existing political parties." The primary values of the First Amendment include "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open."

[¶ 17] In a Presidential election, South Dakota's "enforcement of more stringent ballot access requirements, including filing deadlines, has an impact beyond its own borders. Similarly, the State has a less important interest in regulating Presidential elections than statewide or local elections, because the outcome of the former will be largely determined by voters beyond the State's boundaries." The South Dakota filing deadline challenged in this case "does more than burden the associational rights of independent voters and candidates. It places a significant state-imposed restriction on a nationwide electoral process."

[¶ 18] Although dicta and only in a footnote, the author of the majority opinion opines that "because the interests of minor parties and independent candidates are not well represented in state legislatures (and not at all in South Dakota), the risk that the First Amendment rights of those groups will be ignored in legislative decisimaking may warrant more careful judicial scrutiny."

[¶ 19] Finally, the *Anderson* court discussed the fact that a candidate participating in a primary election is also required to "file early", so to speak. "But both the burdens and the benefits of the respective requirements are materially different, and the reasons for requiring early filing for a primary candidate are inapplicable to independent candidates in the general election." "The early filing deadline for a candidate in a party's primary election is adequately justified by administrative concerns." Ohio, unlike South Dakota, permits "write-in" votes for independents. Even this is not an adequate substitute for having the candidate's name appear on the printed ballot.

[¶ 20] Finally, there is "no reason why two parties should retain a permanent monopoly on the right to have people vote for or against them. Competition in ideas and governmental policies is at the core of our electoral process and of the First Amendment freedoms."

[¶ 21] That portion of the 1999 amendment which altered the filing dates for the filing of petitions to place electors for independent candidates for President of the United States on the general election ballot in South Dakota placed an unconstitutional burden on the voting and associational rights of Nader's supporters. The filing date of the third Tuesday in June as contained in SDCL 12–7–1 is unconstitutional as to independent candidates for President and their supporters. The court determines that the balance of the 1999 amendment is severable and constitutional. It does appear that the South Dakota Legislature would have allowed the balance of the 1999 amendment to take effect without the invalidated section. Therefore, as to independent candidates for President and as to their supporters, the law as it existed prior to the 1999 amendment, namely a filing date of the first Tuesday of August, remains in effect.

[¶ 22] Nothing in this case presents any issue as to what filing date is applicable as to other non-Presidential candidates and the court makes no decision in that regard.

[¶ 23] The issue then becomes: as to Nader, what happened after June 20? Nader attempted to file additional petitions (Exhibit B as received in evidence) on August 25. Adding petitions (Exhibit A as received in evidence) timely filed on June 21 (because mailing constitutes filing under the statute) produces only 1,879 valid signatures that are in compliance with other provisions of South Dakota law. While Nader did obtain total signatures of 2,632 (more than the required 2,602), 753 signatures cannot be counted for various violations of South Dakota law or rules. Thus, extending the filing deadline to August 1 or even to August 25 is of no salvation to Nader. He does not challenge the one per cent requirement as to signatures. This court cannot force Nader on to the ballot when he has been unable to obtain the requisite number of valid signatures. This court declines to enter an injunction or any other order to force Hazeltine to place Nader (or his electors) on the general election ballot. Nader and his supporters were no doubt heavily burdened by what transpired in South Dakota but prudent action on their part would have been to meet the "old deadline" with sufficient valid signatures. This they failed to do.

[¶ 24] The motion of Hazeltine (Doc. 13) asking the court to take judicial notice of an unreported decision from a United States District Judge in North Carolina (which is on appeal) and of an unreported decision from the Circuit Court in Hughes County, South Dakota, should be denied

since the cases are not on point and present no binding precedent.

[¶ 25]  Nader has no probability of success on the merits and the issuance of an injunction, under all the circumstances, would not be in the public interest.  Nader's motion should be denied.

[¶ 26]  Now, therefore,

[¶ 27]  IT IS ORDERED, as follows:

1) The motion of Hazeltine (Doc. 13) asking the court to take judicial notice is denied.

2) The motion of Nader for a preliminary injunction (Doc. 4) is denied.

3) The declaratory relief sought by Nader to the effect that the filing date of the third Tuesday in June contained in SDCL 12–7–1 is unconstitutional as applied to the supporters of and independent candidates for President of the United States is granted.

4) This is a final judgment.

5) Neither costs nor attorney fees shall be taxed or awarded.