**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 13-1368**

_____

AL PISANO; NORTH CAROLINA CONSTITUTION PARTY; NORTH CAROLINA GREEN PARTY; NICHOLAS TRIPLETT,

              Plaintiffs – Appellants,

       v.

KIM WESTBROOK STRACH, as Executive Director of the North Carolina Board of Elections; JOSH HOWARD, as Member of the North Carolina Board of Elections; RHONDA AMOROSO, as Member of the North Carolina Board of Elections; PAUL FOLEY, as Member of the North Carolina Board of Elections; MAJA KRICKER, as Member of the North Carolina Board of Elections; JOSHUA MALCOLM, as Member of the North Carolina Board of Elections,

              Defendants – Appellees.

_____

Appeal from the United States District Court for the Western District of North Carolina, at Charlotte. Graham C. Mullen, Senior District Judge. (3:12-cv-00192-GCM)

_____

Argued: October 29, 2013         Decided: February 27, 2014

_____

Before NIEMEYER, MOTZ, and DIAZ, Circuit Judges.

_____

Affirmed by published opinion. Judge Diaz wrote the opinion, in which Judge Niemeyer and Judge Motz joined.

_____

**ARGUED**: Robert Milton Bastress, Jr., Morgantown, West Virginia, for Appellants. Susannah Porter Holloway, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellees.

**ON BRIEF**: Jason E. Huber, CHARLOTTE SCHOOL OF LAW, Charlotte, North Carolina, for Appellants. Roy Cooper, North Carolina Attorney General, Susan K. Nichols, Special Deputy Attorney General, NORTH CAROLINA DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellees.

---

DIAZ, Circuit Judge:

North Carolina provides three ways for a candidate to appear on a general election ballot when running for a partisan federal, state, county, or municipal office.[1] First, a "recognized" political party may nominate candidates. Second, unaffiliated candidates may petition to appear on a general election ballot. Third, and most relevant here, a "new" political party may nominate candidates.

In this appeal, Al Pisano, Nicholas Triplett, the North Carolina Constitution Party, and the North Carolina Green Party raise an as-applied challenge to North Carolina's May 17 petition-filing deadline for the formation of new political parties.[2] They contend that the deadline violates the First and Fourteenth Amendments because it imposes an unjustified, severe burden on their ability to field presidential candidates. They also assert that the deadline violates the Equal Protection Clause of the Fourteenth Amendment because it places an additional, substantial burden on them that is not imposed on unaffiliated candidates or recognized political parties.

---

[1] An individual may also qualify as a write-in candidate for a non-municipal, partisan office. See N.C. Gen. Stat. § 163-123.

[2] Al Pisano is the chairperson of the North Carolina Constitution Party. Nicholas Triplett is a vice chairperson of the North Carolina Green Party.

The district court held that discovery was not necessary to determine the constitutionality of the deadline and upheld its validity, noting that the deadline has no impact on Plaintiffs' constitutional rights. Even assuming that it did, however, the court concluded that the deadline is justified, and any burden it imposes is ameliorated by other aspects of North Carolina's statutory framework. For the reasons that follow, we affirm.

I.

We begin with a brief sketch of the relevant statutory framework before turning to the issues presented.

A.

North Carolina election law provides that a recognized political party may nominate candidates for federal, state, and local offices. McLaughlin v. N.C. Bd. of Elections, 65 F.3d 1215, 1218 (4th Cir. 1995). Recognized political parties must nominate their candidates by primary election unless only one candidate from that party seeks election for a particular office. Id. at 1219; see also N.C. Gen. Stat. § 163-110. North Carolina recognizes a political party if it polled at least two percent of the entire votes cast in the state for governor or for presidential electors. See N.C. Gen. Stat. § 163-96(a)(1).

A new political party may also nominate candidates. See id. § 163-98. To do so, a qualifying new party must select its

4

candidates by party convention and submit its nominees by July 1.  Id.  To qualify as a new party, a group must file petitions with the State Board of Elections before 12:00 PM on June 1 in the election year in which the group desires to participate. Id. § 163-96(a)(2), (b1).  A separate petition must be filed for each county in which the group gathers signatures.  See id. § 163-96(b), (b1).

The petitions must collectively be "signed by registered and qualified voters in [North Carolina] equal in number to two percent (2%) of the total number of voters who voted in the most recent general election for Governor," with at least 200 signatures from each of at least four congressional districts. Id. § 163-96(a)(2).  In addition to complying with the June 1 deadline, a group must submit each petition for verification to the chairperson of the county board of elections in the county where the signatures were obtained by 5:00 PM on May 17.[3]  Id. § 163-96(b1).

---

[3] The statute does not expressly say that May 17 is the operative deadline.  Rather, it requires that the petitions be submitted to the chairperson "of the county board of elections in the county in which the signatures were obtained no later than 5:00 P.M. on the fifteenth day preceding the date the petitions are due to be filed with the State Board of Elections."  N.C. Gen. Stat. § 163-96(b1).  Although Plaintiffs initially contended that the operative deadline was May 16, see First Am. Compl. ¶ 19 , they now concede the additional day.

5

Groups seeking to form new political parties are not limited to a short time frame for gathering signatures and have notice of the number of signatures required three-and-one-half years before the deadline. This is so because the number of required signatures is based on the total number of votes cast in the previous gubernatorial election. See id. § 163-96(a)(2). North Carolina does not preclude voters from signing petitions based on their party affiliation or from signing multiple petitions.

North Carolina held a primary election on May 8, 2012. The Republican presidential candidate was nominated in August, and the Democratic presidential candidate was nominated in September. The general election was held on November 6. To nominate candidates for North Carolina's general election ballot, a group needed to collect and timely submit 85,379 signatures, a figure amounting to two percent of the total number of votes cast in North Carolina's 2008 gubernatorial election.

B.

The North Carolina Constitution Party and Al Pisano filed suit against the Executive Director of the State Board of Elections and its members on March 27, 2012. On April 6, they filed an amended complaint, joined by the North Carolina Green Party and Nicholas Triplett. Plaintiffs allege that the May 17

6

deadline violates the First and Fourteenth Amendments and the Equal Protection Clause because it severely burdens their ability to field presidential candidates. Although Plaintiffs do not challenge North Carolina's two percent signature requirement, they argue that the deadline, in combination with the signature requirement, creates an impermissible barrier to ballot access. Plaintiffs moved in the district court for a preliminary injunction to prevent enforcement of the May 17 petition-filing deadline in the 2012 presidential election, which the district court denied.

The parties subsequently held a conference in which they agreed not to take discovery until the district court ruled on Defendants' motion for summary judgment or Plaintiffs' motion under Federal Rule of Civil Procedure 56(d) for discovery. The district court denied the Rule 56(d) motion on October 18, 2012, concluding that discovery was not needed to decide whether the May 17 deadline is unconstitutional. The court allowed Plaintiffs time to file additional affidavits before the court ruled on the summary judgment motion, but Plaintiffs did not take advantage of that opportunity.

7

On March 1, 2013, the district court granted Defendants' motion for summary judgment.[4] It first stated that the filing deadline has no impact on Plaintiffs' rights and that it is instead the unchallenged two percent signature requirement that imposes a severe burden. The court then concluded, however, that the filing deadline is constitutional even if it does impose a burden. Applying strict scrutiny, the court determined that the deadline is narrowly tailored and that any burden it imposes "is significantly lessened by the alleviating factors in the overall statutory scheme." J.A. 96-97. The district court also rejected Plaintiffs' equal protection claim, holding that groups seeking to form new political parties are not similarly situated to unaffiliated candidates or recognized political parties. This appeal followed.

II.

A.

Plaintiffs first argue that the district court erred in denying their Rule 56(d) motion. Rule 56(d) mandates that

---

[4] The district court ruled on the merits of Plaintiffs' claims after the November 2012 general election. The case is not moot, however, because Plaintiffs' challenge to the May 17 deadline falls under the "capable of repetition, yet evading review" exception to the mootness doctrine. See Norman v. Reed, 502 U.S. 279, 287-88 (1992) (internal quotation marks omitted).

summary judgment be denied when the nonmovant "has not had the opportunity to discover information that is essential to his opposition."[5] Ingle ex rel. Estate of Ingle v. Yelton, 439 F.3d 191, 195 (4th Cir. 2006) (internal quotation marks omitted). A court should hesitate before denying a Rule 56(d) motion when the nonmovant seeks necessary information possessed only by the movant. Id. at 196-97. But a court may deny a Rule 56(d) motion when the information sought would not by itself create a genuine issue of material fact sufficient for the nonmovant to survive summary judgment. Id. at 195. We review a district court's denial of a Rule 56(d) motion for abuse of discretion. Greater Balt. Ctr. for Pregnancy Concerns, Inc., 721 F.3d at 280.

Plaintiffs sought the following discovery: (1) production of any state records regarding minor parties' attempts to gain ballot access for presidential candidates in North Carolina; (2) a deposition of Gary Bartlett, then Executive Director of the State Board of Elections, to explore North Carolina's justifications for the May 17 deadline; and (3) information from officials in other states as to the efficacy of later filing

---

[5] "By amendment that took effect on December 1, 2010, former Rule 56(f) was carried forward into subdivision (d) without substantial change." Greater Balt. Ctr. for Pregnancy Concerns, Inc., v. Mayor of Balt., 721 F.3d 264, 275 n.6 (4th Cir. 2013) (en banc).

9

deadlines. They contend that this discovery was essential to their ability to oppose summary judgment.

We conclude that the district court did not abuse its discretion on this issue. To begin with, the record includes information regarding other minor parties' efforts to gain ballot access in recent years. Between 1996 and 2012, the Libertarian Party qualified as a new party four times and qualified once as a recognized political party based on previous election results. The Reform Party qualified as a new party twice, and the Natural Law Party and the Americans Elect Party each qualified as a new party once. We also know that as of April 17, 2012, five groups other than Plaintiffs had expressed interest in forming new political parties but had not submitted any signatures. In addition, the State Board of Elections posts the status of current statewide petitions in each county on its website. Plaintiffs do not appear to dispute this record evidence; they simply want more.

Plaintiffs complain that they do not know precisely how many groups have attempted but failed to qualify as new political parties. True enough, but we are satisfied that this information by itself would not create a genuine issue of material fact sufficient to preclude summary judgment, given that the question before us is principally one of law, and there is a wealth of case law assessing similar challenges.

Second, with respect to North Carolina's reasons for the May 17 deadline, the record provides justifications. In a sworn declaration, Bartlett highlighted the problems that the state fears would arise without ballot-access requirements, including "tremendous voter confusion and chaos." J.A. 19. At bottom, Plaintiffs want to compel North Carolina to say more in support of the May 17 deadline. But the fact that Plaintiffs believe the state has provided only ephemeral support for the deadline goes to the merits of their claim--not to whether the district court properly denied the Rule 56(d) motion.

Finally, Plaintiffs sought information from officials in other states about possible alternatives to the May 17 deadline, presumably to attack the merits of North Carolina's choice. The district court, however, did not bar Plaintiffs from obtaining and presenting that evidence. To the contrary, it gave Plaintiffs ample opportunity to offer additional affidavits before considering the summary judgment motion, but Plaintiffs simply chose not to do so.

We find no abuse of discretion on this record.

B.

We next consider whether the May 17 petition-filing deadline violates Plaintiffs' First and Fourteenth Amendment rights. We review the district court's grant of summary

11

judgment de novo. See S.C. Green Party v. S.C. State Election Comm'n, 612 F.3d 752, 755 (4th Cir. 2010).

It is well established that ballot-access restrictions "implicate substantial voting, associational and expressive rights protected by the First and Fourteenth Amendments." McLaughlin, 65 F.3d at 1221. In analyzing whether state election laws impermissibly infringe on such rights, the Supreme Court has instructed us to weigh

> 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'

Burdick v. Takushi, 504 U.S. 428, 434 (1992) (quoting Anderson v. Celebrezze, 460 U.S. 780, 789 (1983)).

Applying the Anderson/Burdick framework, we have stated that election laws that impose a severe burden on ballot access are subject to strict scrutiny, and a court applying strict scrutiny may uphold the restrictions only if they are "narrowly drawn to advance a state interest of compelling importance." McLaughlin, 65 F.3d at 1220 (internal quotation marks omitted). On the other hand, "if a statute imposes only modest burdens, then a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions."

12

S.C. Green Party, 612 F.3d at 756 (internal quotation marks omitted).

When deciding whether a state's filing deadline is unconstitutionally burdensome, we evaluate the combined effect of the state's ballot-access regulations. See Wood v. Meadows, 207 F.3d 708, 711 (4th Cir. 2000) ("When determining whether a given state's filing deadline unconstitutionally burdens candidates' and voters' rights, a court must examine that state's ballot access scheme in its entirety.").

Although the district court relied on our decision in McLaughlin when it applied strict scrutiny, we do not believe that McLaughlin addresses the appropriate level of scrutiny that we should apply here. There, we considered several challenges to North Carolina's then-applicable statutory framework, including its retention requirement to qualify as a recognized political party. See 65 F.3d at 1220. Then, as now, North Carolina imposed a two percent signature requirement on groups seeking to form new political parties. See id. at 1219. At the time, however, the state also required that a notarized affidavit and a five-cent verification fee accompany each signature.[6] Id. at 1218. Furthermore, a political party could

---

[6] The district court had invalidated the notarized affidavit and five-cent verification fee requirements, and the state did not cross appeal. Id. at 1220.

13

only retain the right to field candidates if its nominee for governor or for president received at least ten percent of the votes cast in the previous general election for governor or president.[7] Id. at 1219.

In McLaughlin, the Libertarian Party challenged the ten percent retention requirement, as it had satisfied the requirements to form a new political party multiple times. Id. at 1219-20. We recognized that the burden imposed by North Carolina's then-applicable restrictions was "undoubtedly severe" because, "as history reveal[ed], those regulations ma[d]e it extremely difficult for any 'third party' to participate in electoral politics." Id. at 1221. Moreover, we expressed concern about the regulations' impact on candidates for local offices. In effect, the regulations prevented any third-party candidates for local offices from designating their party affiliation on the ballot unless their group met the two percent or ten percent requirements--even if the corresponding number of signatures or votes far exceeded the number of people entitled to vote for that local office. Id. at 1224. Concluding that strict scrutiny applied because the restrictions imposed a severe burden, see id. at 1221, we nevertheless rejected the

---

[7] The ten percent requirement has since been repealed. See Electoral Fairness Act, 2006 N.C. Sess. Laws 234 § 1 (changing the ten percent requirement to a two percent requirement).

14

Libertarian Party's challenge in light of applicable Supreme Court precedent, id. at 1225-26.  We did not expressly decide, however, whether North Carolina's filing deadline is constitutional.[8]

Nor does McLaughlin mandate that we apply strict scrutiny in this case.  In McLaughlin, we considered a significantly more restrictive statutory framework in the context of a different type of challenge.  North Carolina no longer requires groups seeking new party status to submit notarized affidavits and verification fees, nor does it impose a ten percent retention requirement.  See N.C. Gen. Stat. § 163-96.  Thus, the pre-1996 history that we discussed in McLaughlin is immaterial to the question at hand: whether the current statutory framework imposes a severe burden.  In addition, Plaintiffs challenge the filing deadline only in the context of presidential elections, which involve the entire statewide electorate.  Thus, our concern in McLaughlin about the regulations' effect on candidates in local elections is irrelevant here.

With this background in mind, we address the constitutionality of the May 17 petition-filing deadline as

---

[8] We note that since our 1995 decision in McLaughlin, minor parties have met the two percent signature requirement eight times in presidential election years, and the Libertarian Party placed its candidate on the 2012 ballot by satisfying the ballot retention provision.

applied to Plaintiffs. Consistent with the Supreme Court's analytical framework, "we base our conclusions directly on the First and Fourteenth Amendments and do not engage in a separate Equal Protection Clause analysis." Norman, 502 U.S. at 288 n.8 (quoting Anderson, 460 U.S. at 786 n.7); see also Libertarian Party of Ohio v. Blackwell, 462 F.3d 579, 586 n.6 (6th Cir. 2006)(same); Council of Alt. Political Parties v. Hooks, 179 F.3d 64, 70 n.7 (3d Cir. 1999)(same).

C.

1.

We first address whether the filing deadline imposes a severe burden on Plaintiffs' constitutional rights. Plaintiffs assert that the May 17 deadline, in combination with the unchallenged two percent signature requirement, creates an impermissible barrier to ballot access.[9] Specifically, Plaintiffs contend that the May 17 deadline prevents them from gathering signatures at the height of the presidential election

---

[9] Plaintiffs place great emphasis on a 1988 letter from North Carolina's Office of the Attorney General that suggests the May 17 deadline is unconstitutional. In that letter, however, the Attorney General's Office appears to have read Anderson to require strict scrutiny review in all cases challenging ballot access restrictions. The Court has since clarified that Anderson does not compel strict scrutiny review in all cases, but instead only when the burden imposed is severe. See Burdick, 504 U.S. at 434. In any event, this letter has no bearing on our resolution of this case.

16

season.  According to them, early filing deadlines impose a severe burden by requiring parties to gather signatures when the election is remote, before voters focus on the campaigns. Plaintiffs emphasize that the May 17 deadline comes before most of the presidential candidates have been selected and before the candidates' political platforms are defined.

Plaintiffs' argument ignores important alleviating factors in North Carolina's statutory framework.  North Carolina does not limit groups to a short time frame for gathering signatures, and groups are on notice of the number of signatures they need to collect <u>three-and-one-half years</u> before the deadline. Plaintiffs thus have ample opportunity to collect signatures when voters are engaged, such as during primaries and other elections.  And they have a large pool from which to collect signatures, as the state does not preclude voters from signing petitions based on their party affiliation or from signing multiple petitions.

Plaintiffs also misconstrue the timeline for presidential election cycles.  Although the Republican and Democratic parties did not officially nominate their candidates for president until August and September of 2012, the names of potential recognized-party candidates and their platforms were known well before the May 17 deadline.  Given that North Carolina held a primary on May 8, 2012, the May 17 deadline allowed Plaintiffs to engage

17

voters during the height of the primary season. Indeed, Plaintiffs could have collected signatures from registered voters at polling locations during the early voting period and on the day of the May primary.

The cases Plaintiffs cite, wherein courts have struck down filing deadlines, are inapposite, principally because the deadlines in those cases preceded the state's primary.[10] See, e.g., Anderson, 460 U.S. at 804 n.31, 806 (striking down Ohio's filing deadline for unaffiliated presidential candidates, which fell in March--75 days before a June primary); Nader v. Brewer, 531 F.3d 1028, 1038-40 (9th Cir. 2008) (striking down Arizona's filing deadline for unaffiliated candidates, which fell in June--90 days before the primary); MacBride v. Exon, 558 F.2d 443, 446, 448-49 (8th Cir. 1977) (striking down Nebraska's deadline for the formation of new political parties, which fell in February--90 days before the primary). As the Sixth Circuit has explained, "the great weight of authority . . . has distinguished between filing deadlines well in advance of the primary and general elections and deadlines falling closer to

---

[10] Plaintiffs cite one federal district court case that did not address whether the filing deadline fell before or after the presidential primary. See Nader 2000 Primary Comm., Inc. v. Hazeltine, 110 F. Supp. 2d 1201, 1208-09 (D.S.D. 2000) (striking down June 20 deadline for unaffiliated presidential candidates). We do not find the reasoning of that case persuasive.

the dates of those elections." Libertarian Party of Ohio, 462 F.3d at 590.

Election law schemes with modest signature requirements and filing deadlines falling close to or after the primary election are the relevant points of comparison. We, and several of our sister circuits, have found that such schemes do not impose severe burdens. See, e.g., Swanson v. Worley, 490 F.3d 894, 905-06, 910 (11th Cir. 2007) (upholding Alabama's primary-day filing deadline, in combination with a three percent signature requirement, for unaffiliated candidates in local and statewide elections); Lawrence v. Blackwell, 430 F.3d 368, 370, 375 (6th Cir. 2005) (upholding Ohio's primary-eve filing deadline for unaffiliated congressional candidates, in combination with a one percent signature requirement); Wood, 207 F.3d at 713-14, 717 (upholding Virginia's primary-day filing deadline, in combination with a 0.5% signature requirement, for unaffiliated candidates in local and statewide elections).

Plaintiffs have not shown that North Carolina's scheme burdens them in any meaningful way. In that respect, this case is far different from Anderson, where the Supreme Court held Ohio's March 20 filing deadline for unaffiliated presidential

19

candidates unconstitutional.[11]  See 460 U.S. at 806.  There, the deadline fell 75 days before a June primary.  Id. at 804 n.31. Anderson's supporters submitted a petition that satisfied all of Ohio's statutory requirements, but the state refused to accept it solely because it was about two months late.[12]  Id. at 782. The Court explained that the March filing deadline burdened unaffiliated candidates who decided to run before the deadline because they were forced to gather signatures "[w]hen the primary campaigns [were] far in the future and the election itself [was] even more remote."  Id. at 792.  The deadline also excluded any unaffiliated presidential candidate who decided to run after the deadline.  Id.  Ultimately, the Court concluded

---

[11] Plaintiffs' challenge is also far different from cases in our circuit in which we have found that ballot-access requirements impose a severe burden and fail strict scrutiny. See, e.g., Libertarian Party of Va. v. Judd, 718 F.3d 308, 317-19 (4th Cir. 2013) (holding that residency restrictions on petition witnesses fail strict scrutiny because the restrictions impose a severe burden and the state "produced no concrete evidence of persuasive force explaining why the plaintiffs' proposed solution . . . would be unworkable or impracticable"). In Judd, we explained that there was a general consensus among our sister circuits that residency restrictions on petition witnesses created a severe burden.  Id. at 317.  Here, there is no such consensus, and the weight of authority cuts against Plaintiffs' position.

[12] Anderson's name nonetheless appeared on Ohio's ballot because the district court held that the filing deadline was unconstitutional, and the state did not seek to stay the district court's order.  Id. at 783-84.  The appeal was pending on the date of the presidential election.  Id. at 784.

20

that the burden the filing deadline imposed "unquestionably outweigh[ed] the State's minimal interest in imposing a March deadline."  Id. at 806.

Unlike the March 20 deadline in Anderson, however, North Carolina's May 17 petition-filing deadline falls after the state's May primary.  And although not dispositive, Plaintiffs here did not come close to meeting the other petition requirements for the 2012 general election--most notably the two percent signature requirement.  By April 17, 2012, the North Carolina Constitution Party had submitted only 3,521 signatures--2,827 of which had been verified by the relevant counties--out of a required 85,379.  The North Carolina Green Party had submitted no petitions by that date.  Moreover, neither party submitted any petitions between the date of the May primary and the filing deadline.

In sum, we are not persuaded that the May 17 deadline, considered in the context of North Carolina's ballot-access scheme, imposes a severe burden on Plaintiffs' ability to form new parties and nominate candidates.  To the contrary, because Plaintiffs have ample time and opportunity to collect the reasonable number of required signatures, we conclude that the burden on Plaintiffs is modest.

2.

Because the deadline does not impose a severe burden, we decline to apply strict scrutiny to Plaintiffs' claim.[13] Instead, we simply "balance the character and magnitude of the burdens imposed against the extent to which the regulations advance the state's interests in ensuring that 'order, rather than chaos, is to accompany the democratic processes.'" McLaughlin, 65 F.3d at 1221 (quoting Storer v. Brown, 415 U.S. 724, 730 (1974)). North Carolina's "asserted regulatory interests need only be sufficiently weighty to justify the limitation imposed on the [plaintiffs'] rights." See Timmons v. Twin Cities Area New Party, 520 U.S. 351, 364 (1997) (internal quotation marks omitted).

To support its choice of a May 17 deadline, North Carolina relies on its general interest in regulating the election process. There is "an important state interest in requiring

---

[13] In its appellate brief, the state did not contest the district court's application of strict scrutiny to Plaintiffs' challenge. We, however, are not bound by that concession but rather must independently determine the proper standard of review. See Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 99 (1991) ("When an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law."); see also United States ex rel. May v. Purdue Pharma L.P., 737 F.3d 908, 913 n.3 (4th Cir. 2013) (citing Kamen and explaining that a party's failure to raise a particular argument "does not preclude our consideration and application of it").

some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot--the interest, if no other, in avoiding confusion, deception, and even frustration of the democratic process at the general election." Jenness v. Fortson, 403 U.S. 431, 442 (1971). States are not required "to make a particularized showing of the existence of voter confusion, ballot overcrowding, or the presence of frivolous candidacies prior to the imposition of reasonable restrictions on ballot access."[14] Munro v. Socialist Workers Party, 479 U.S. 189, 194-95 (1986). Indeed, states have an interest "in ensuring orderly, fair, and efficient procedures for the election of public officials." See S.C. Green Party, 612 F.3d at 759. This interest necessarily requires the imposition of some cutoff period "to verify the validity of signatures on the petitions, to print the ballots, and, if necessary, to litigate any challenges." See Am. Party of Tex. v. White, 415 U.S. 767, 787, n.18 (1974).

Plaintiffs concede the state's interest in regulating elections generally, but they argue that its interest in regulating presidential elections is diminished. It is true

---

[14] As the record shows, North Carolina's ballot is often lengthy, which has contributed to lines at the polls and increased costs for additional tabulators in counties that use paper ballots.

23

that "in a Presidential election a State's enforcement of more stringent ballot access requirements, including filing deadlines, has an impact beyond its own borders." Anderson, 460 U.S. at 795. Indeed, a state has a "less important interest in regulating Presidential elections than statewide or local elections, because the outcome of the former will be largely determined by voters beyond the State's boundaries." Id. Even so, states maintain an interest in regulating presidential elections.

We conclude that North Carolina's choice of a May 17 deadline is reasonable, especially in context. The deadline falls after the state's May primary and precedes other important deadlines. Notably, the counties need time to verify signatures before the June 1 deadline. And even putting the June 1 deadline aside, North Carolina also requires qualifying new parties to select their nominees by party convention and submit their names by July 1. These deadlines permit the government to verify signatures and prepare the ballot before the November election. Accepting Plaintiffs' argument would require us to overturn all of North Carolina's pre-election deadlines for new parties. Having determined that the May 17 deadline is reasonable, we decline this invitation.

Balancing "the character and magnitude of the burdens imposed against the extent to which the regulations advance the

24

state's interests," <u>McLaughlin</u>, 65 F.3d at 1221, we find that North Carolina's choice of May 17 as the operative deadline outweighs the modest burden imposed on Plaintiffs. Accordingly, we hold that the May 17 petition-filing deadline is constitutional as applied to Plaintiffs.

## III.

For the reasons given, the district court's judgment is

<u>AFFIRMED</u>.