**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 19-1783**

ROBERT S. JOHNSTON, III; LIBERTARIAN PARTY OF MARYLAND,

Plaintiffs - Appellants,

v.

LINDA H. LAMONE, in Her Official Capacity as Administrator of the Maryland
State Board of Elections,

Defendant - Appellee.

Appeal from the United States District Court for the District of Maryland at Baltimore.
Catherine C. Blake, District Judge.  (1:18-cv-03988-CCB)

Argued:  January 29, 2020                    Decided:  March 3, 2020

Before AGEE, DIAZ, and HARRIS, Circuit Judges.

Affirmed by unpublished per curiam opinion.

**ARGUED:**  Mark Daniel Davis, HARRIS, WILTSHIRE & GRANNIS LLP, Washington,
D.C., for Appellants.  Andrea William Trento, OFFICE OF THE ATTORNEY GENERAL
OF MARYLAND, Baltimore, Maryland, for Appellee.  **ON BRIEF:**  Mark A. Grannis,
HARRIS, WILTSHIRE & GRANNIS, LLP, Washington, D.C., for Appellants.  Brian E.
Frosh, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND,
Baltimore, Maryland, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

This case involves a constitutional challenge to the process by which Maryland recognizes political parties, so that they may place their preferred candidates on the ballot. The Libertarian Party of Maryland and its State Chairman sued the Maryland State Board of Elections ("the Board"), alleging that Maryland's party-recognition system unconstitutionally burdens the Party's access to the ballot in two ways: first, by requiring the Libertarian Party to submit the signatures of 10,000 registered voters, even though more than 22,000 Maryland voters already are affiliated with the Party; and second, through certain applications of the statutory standard used to evaluate the validity of those signatures.

The district court granted the Board's motion to dismiss, finding that the burden imposed by the 10,000-signature requirement was modest and justified by an important regulatory interest, and that the challenge to the Board's signature-validation practices was not ripe for adjudication. *Johnston v. Lamone*, 401 F. Supp. 3d 598 (D. Md. 2019). Substantially for the reasons given by the district court, we affirm.

## I.

Like many states, Maryland maintains a two-tier system for the recognition of political parties which, once recognized, are entitled to ballot access. *See Mathers v. Morris*, 515 F. Supp. 931, 937 (D. Md.), *aff'd*, 454 U.S. 934 (1981) (approving an earlier and more exacting version of Maryland's two-tier system); *McLaughlin v. N.C. Bd. of Elections*, 65 F.3d 1215, 1222–23, 1226 (4th Cir. 1995) (approving North Carolina's

3

two-tier system). The defining feature of these two-tier systems is that the requirements for initial recognition, at the first tier, are relatively modest, while "somewhat higher levels of support" must be shown under the second "in order to maintain political party status." *Mathers*, 515 F. Supp. at 937.

Specifically, for initial recognition, Maryland law requires the submission to the Board of a petition signed by at least 10,000 registered Maryland voters, collected within two years of the filing date. Md. Code, Elec. Law § 4-102(b)(2). Those signatures must satisfy what the district court referred to as Maryland's "name standard," *Johnston*, 401 F. Supp. 3d at 606, which requires a close match between a voter's signature and that voter's name as it appears on the statewide voter registration list. *See* Md. Code, Elec. Law §§ 6-203(a)(1), 6-207(a)(1).[1] Once granted, a party retains this initial recognition, and thus its access to the ballot, for two statewide general election cycles. Md. Code, Elec. Law § 4-103(a)(1).

At that point, the party becomes subject to the second tier of Maryland's ballot-access system. To maintain its official status, the party must demonstrate continued voter support in one of two ways: by winning at least one percent of the vote for its candidate for the highest office (either President or Governor) in the last statewide general election; or by securing the party affiliation of at least one percent of all registered

---

[1] Specifically, the Board may deem a petition signature to be valid only if the signature either matches "the individual's name as it appears on the statewide voter registration list" or includes "the individual's surname of registration and at least one full given name and the initials of any other names." Md. Code, Elec. Law § 6-203(a)(1).

4

Maryland voters. Md. Code, Elec. Law §§ 4-103(a)(2)(i), (ii). If a party cannot satisfy either of those tier-two metrics of support, then it must go back to tier one and submit a new petition for recognition with 10,000 signatures. Md. Code, Elec. Law § 4-103(c); *see Mathers*, 515 F. Supp. at 936–37 (describing and approving an earlier version of Maryland's two-tier system, with a three-percent support requirement under the second tier).

As the district court explained, the Libertarian Party has had considerable success under Maryland's two-tier system, obtaining recognition as a political party and extending that status multiple times. *See Johnston*, 401 F. Supp. 3d at 602. But in 2018, the Party's gubernatorial candidate received less than one percent of the votes cast, and the Party's number of affiliated voters – over 22,000 – amounted to less than one percent of all registered Maryland voters. As a result, the Party could not satisfy either standard for continued support under the second tier, and was scheduled to lose its status as a state-recognized party on December 31, 2018 – which would make its future ballot access contingent on requalifying as a party by meeting tier one's 10,000-signature requirement.

To avoid that result, the Libertarian Party of Maryland and its State Chairman, Robert S. Johnson, III, filed the two-count complaint at issue in this appeal, naming as the defendant Linda H. Lamone, the Board's Administrator.[2] In Count One, the plaintiffs

---

[2] After filing the complaint, the Party and Johnston sought a temporary restraining order and preliminary injunction to prevent the Board from removing the Party from the list of state-recognized political parties on Maryland's voter-registration application and associated forms. The district court quickly held a hearing and denied the motion. The Party and Johnston have not appealed that decision.

sought relief from the 10,000-signature requirement for party requalification. The gist of their position, as the district court described it, was that Maryland's two-tier ballot-access protocol was unconstitutional as presently applied to the Party "because over 22,000 Marylanders remain registered as Libertarians, and requiring new signatures would be a costly but gratuitous exercise advancing [an] insufficient state interest." *Id.* In Count Two, the plaintiffs challenged certain potential applications of the Board's signature-validation standard to any petition for recognition that the Party might file in the future. The plaintiffs alleged, based on past experience, that the Board sometimes disqualifies signatures under this standard even when it can identify the relevant voter and then use the signature for other administrative purposes, such as updating a voter's status from "inactive" to "active." So applied, the plaintiffs argued, the "name standard" is unconstitutional. *See id.* at 606 (describing plaintiffs' claim that the name standard is "unconstitutional as applied to Party petitions to the extent that the state invalidates names despite matching them to the voter registration[] rolls and otherwise using" them for administrative purposes).

In a thorough and well-reasoned opinion, the district court granted the Board's motion to dismiss the complaint. As the court explained, challenges to state election laws are governed by the *Anderson-Burdick* framework, which balances a state's asserted interest in regulating its elections against a plaintiff's voting, associational, and expressive rights under the First and Fourteenth Amendments. *See Johnston*, 401 F. Supp. 3d at 602–03; *see also Burdick v. Takushi*, 504 U.S. 428 (1992); *Anderson v. Celebrezze*, 460 U.S. 780 (1983). Under that framework, the severity of the burden imposed "dictates the level of justification" required: "Severe" burdens trigger strict scrutiny, but if the burden is only

6

"modest," then a state's "important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions." *Johnston*, 401 F. Supp. 3d at 603 (quoting *Pisano v. Strach*, 743 F.3d 927, 933 (4th Cir. 2014)).

As to the 10,000-signature requirement for requalification, the court determined, first, that it imposed only a modest burden on the state Libertarian Party. The court accepted the plaintiffs' allegations about the time and expense that would be involved in meeting that requirement. *Id.* at 603. But similar or more onerous requirements already had been deemed "modest" and approved in other cases, the court reasoned. *Id.* at 604 (citing, *e.g.*, *Mathers*, 515 F. Supp. at 937 (holding that Maryland's "statutory requirement of 10,000 signatures statewide for initial qualification . . . is a relatively minor restriction [that] does not unduly burden the rights of those seeking status as a political party"), and *Pisano*, 743 F.3d at 934 (finding a North Carolina requirement amounting to 85,739 signatures to be a "modest" burden). Nor, the court noted, had the 10,000-signature requirement "prevented the Party from reacquiring recognition time and again" in Maryland. *Id.* at 603. Accordingly, the court concluded, further factual development was unnecessary, and the burden imposed, "as a matter of law, is modest." *Id.* at 604.

The district court also held that the 10,000-signature requalification requirement advances "important regulatory interests" sufficient to justify a modest burden under *Anderson-Burdick*. The heart of the plaintiffs' case, the district court recognized, was the contention that any burden – modest or otherwise – imposed by the 10,000-signature requirement was "wholly superfluous" as applied to a party with 22,000 registered-voter affiliates: 10,000 new petition signatures would tell the Board nothing it did not know

7

already about statewide support for the Libertarian Party.  *Id.*  But as the district court explained, two-tier systems like Maryland's, requiring a higher level of support for maintenance of party status than for initial recognition,[3] already have been upheld: Because of the initial "lower ballot access requirement" at tier one, those policies are "inclusive, not . . . exclusive," and "[i]t is not unfair to expect a party to improve its showing of support" in order to retain ballot access.  *Id.* at 605 (quoting *McLaughlin*, 65 F.3d at 1222).  The district court also rejected the plaintiffs' claim that their 22,000 voter affiliations rendered a 10,000-signature requirement entirely redundant.  Here, the court emphasized the "temporal axis" of the requirement:  Because tier-one's voter signatures must be collected in the two-year period before submission, they are a "gauge of *contemporaneous* support" in a way that voters' party affiliations, which remain until affirmatively changed and may be outdated, are not.  *Id.* at 605–06 (emphasis added).

The district court then turned to the plaintiffs' challenge to the Board's application of the signature-validation standard and concluded, in agreement with the Board, that it was not ripe for review.  Whether a case is ripe, the court explained, turns on a "balance" of "the fitness of the issues for judicial decision with the hardship to the parties of withholding court consideration."  *Id.* at 607; *see also Miller v. Brown*, 462 F.3d 312, 319 (4th Cir. 2006).  Here, the court concluded, "uncertainties surrounding the submission of

---

[3] According to the Board, the Libertarian Party would need approximately 42,500 party affiliations under tier two – well above the 10,000 signatures required under tier one, and more than the 22,000 secured by the Party – to qualify for continued recognition on that ground.

a new political party petition" by the Libertarian Party – including whether one would be submitted at all, how many signatures on the hypothetical petition would be invalidated, and for what reason – made the plaintiffs' claim "insufficiently clean cut and concrete" for adjudication. *Johnston*, 401 F. Supp. 3d at 607 (internal quotation marks omitted). Given the remaining "contingencies," the court concluded, "the name standard would be better litigated if and when there are concrete signature invalidations in the record." *Id.* at 608.

Moreover, the court found, delaying resolution of the claim until it was more sharply presented would impose "comparatively little hardship" on the Party. *Id.* at 608 n.6. The plaintiffs were not challenging the name standard on its face, and however a court might resolve their claim about the Board's use of disqualified signatures for other purposes, they would be required to collect the same 10,000 valid signatures. *See id.* And because the Party may submit signatures in stages – supplementing its petition with additional signatures if the number of signature disqualifications makes it necessary to do so, *see* Md. Code, Elec. Law § 6-205(d) – it might choose to litigate specific applications of the name standard as they arose or simply to submit additional valid signatures. *See Johnston*, 401 F. Supp. 3d at 608 n.6. Finally, the court emphasized the constitutional nature of the plaintiffs' claims, reasoning that "prudential doctrines of judicial restraint counsel particular caution in the face of factually underdeveloped constitutional questions." *Id.* at 608.

In a subsequent order, the district court dismissed the plaintiffs' action with prejudice. This timely appeal followed.

9

## II.

We review de novo a district court's dismissal of a complaint for lack of jurisdiction and for failure to state a claim. *See Berkley v. Mountain Valley Pipeline, LLC*, 896 F.3d 624, 629 (4th Cir. 2018); *Andon, LLC v. City of Newport News*, 813 F.3d 510, 513 (4th Cir. 2016). On appeal, the parties advance substantially the same arguments they presented to the district court. And for substantially the same reasons given by the district court in its opinion, we now affirm the dismissal of the plaintiffs' action.

With respect to the 10,000-signature requalification requirement, the plaintiffs emphasize on appeal their contention that whether an election-law burden is "modest" or "severe" is a sufficiently "fact-intensive inquiry" that dismissal at the pleadings stage under Rule 12(b)(6) is inappropriate. But as the district court explained, that "argument is squarely foreclosed by precedent." *Johnston*, 401 F. Supp. 3d at 604. The question of a burden's severity, we have held, is "principally one of law," which may be resolved by reference to "case law assessing similar challenges," *Pisano*, 743 F.3d at 932 – precisely the approach taken by the district court here, *see Johnston*, 401 F. Supp. 3d at 604 (comparing the 10,000-signature requirement to other signature requirements evaluated and approved by courts). Indeed, we recently recognized that while "the severity of the burden imposed by an electoral regulation is a context-dependent inquiry[, t]hat inquiry may nevertheless be resolved on a motion to dismiss because its resolution generally depends on legal – rather than factual – sources and considerations." *Fusaro v. Cogan*, 930 F.3d 241, 259 (4th Cir. 2019). Accordingly, we find no error in the district court's determination that further factual development was not required here.

10

We also agree with the district court on the merits of the plaintiffs' challenge to the 10,000-signature requirement. First, notwithstanding the plaintiffs' protestations to the contrary, theirs is indeed a challenge to the very notion of a two-tier system: The entire gravamen of their complaint is that because Maryland requires no more than 10,000 signatures to qualify for initial recognition at tier one, they should be entitled to continued recognition if they have more than 10,000 affiliated voters at tier two. But as we noted in *McLaughlin*, in approving North Carolina's two-tier system, courts both within and outside this circuit have "upheld two-tier ballot access schemes that require a party to exhibit a *greater* showing of support to remain on the ballot than that party needed to place a candidate in the first place." 65 F.3d at 1222–23 (emphasis added). That precedent by itself effectively forecloses the heart of the plaintiffs' claim.

In any event, we find no error in the district court's analysis of the particulars of the plaintiffs' challenge under the *Anderson-Burdick* framework. Considering the "combined effect" of Maryland's party-recognition regulations, *see Pisano*, 743 F.3d at 933, we agree with the district court that the 10,000-signature requirement for requalification, with signatures to be collected within two years of submission, qualifies as a "modest" burden, given case law deeming "modest" other signature requirements that are more onerous than Maryland's, *see Johnston*, 401 F. Supp. 3d at 604 (citing cases); *Pisano*, 743 F.3d at 936 (finding that a "modest" burden was imposed by North Carolina's requirement of 85,739 signatures – two percent of the total votes cast in the state's last general election – to be collected over a three-and-a-half-year period). And for the reasons given by the district court, we think there is the requisite "reasonable" fit between the 10,000-signature

11

requirement and Maryland's undoubtedly important interest in ensuring "a significant modicum of support" for parties that will appear on its ballot. *See Pisano*, 743 F.3d at 933 (outlining standard of review for modest burdens); *Jenness v. Fortson*, 403 U.S. 431, 442 (1971) (recognizing as "important" the state interest in ensuring a "significant modicum of support"). In particular, we agree with the district court that the two-year limit on the collection of signatures at the first tier of Maryland's system means that those signatures are not interchangeable with party affiliations at the second, which may include outdated party registrations that do not reflect current voter sentiment. *See Johnston*, 401 F. Supp. 3d at 605–06.

Finally, we agree with the district court that the plaintiffs' challenge to certain signature disqualifications under the name standard – those that occur even when the Board is able to match a signature to the voter-registration roll and uses it for other purposes – is not yet ripe for review. First, as the district court explained, is the fact that the claim may never require judicial resolution at all. *Cf. Miller*, 462 F.3d at 319 (issue is "fit for judicial decision" if it is not "dependent on future uncertainties"). The Party might not submit a new petition for recognition, for instance; or the Board may accept as valid at least 10,000 of a hypothetical petition's supporting signatures; or the Board could disqualify a critical number of signatures but *not* use any of them for other administrative purposes, meaning that those disqualifications would fall outside the scope of the plaintiffs' claim. Under any of these circumstances, there will be no need for a court to wade into this constitutional dispute. *See Johnston*, 401 F. Supp. 3d at 608 (especially in constitutional cases, courts should "tread lightly to avoid premature adjudication"). Second, the nature of the

12

plaintiffs' claim – focused on the potential that the Board could rely on some uncertain number of disqualified signatures for some other administrative purpose – means that there is a particular lack of factual concreteness here. No statute or regulation sanctions or guides the practice to which the plaintiffs object, so a court would find it difficult to define and evaluate that practice without more information – information that will develop only if and when the Party submits a new petition for recognition. *See id.* at 607–08.

And like the district court, we think that withholding consideration of this issue until it is presented more sharply will present only a minimal hardship to the Party. *See Miller*, 462 F.3d at 319 (considering "hardship to the parties of withholding court consideration"). As the court explained, however their challenge to certain applications of the name standard is resolved, the plaintiffs still will be required to collect at least 10,000 signatures. And because they cannot know in advance which signatures, though technically deficient, might later be verified by the Board and used for some other administrative purpose, whether they prevail on their claim or not, the plaintiffs have the same incentive to ensure that every signature they gather meets the formal requirements of Maryland law. *See* Md. Code, Elec. Law §§ 4-102(b)(2), 6-203(a). Finally, as the district court pointed out, Maryland law allows the Party to submit signatures for a future petition in stages, so that it may submit additional qualifying signatures as necessary or, if there have been disqualifications that fall within the scope of its as-applied challenge, litigate those specific invalidations as they occur. *See Johnston*, 401 F. Supp. 3d at 608 n.6. Given the dispatch with which the district court has handled this litigation to date, we do not doubt that it will be possible for the Party to challenge particular applications of the name standard, should

13

that become necessary, before an election is imminent. *Cf. Miller*, 462 F.3d at 320 (allowing election-law challenge to go forward where a law was causing "immediate harm" and postponement might leave challengers without a remedy or cause disruption on the "eve of [a] pending election[]").

Accordingly, for the reasons given by the district court, we affirm the dismissal of the plaintiffs' claims.[4]

*AFFIRMED*

---

[4] We note that when a court dismisses a claim on ripeness grounds, that dismissal generally is without prejudice. *See Scoggins v. Lee's Crossing Homeowners Ass'n*, 718 F.3d 262, 276 (4th Cir. 2013). We therefore amend the district court's dismissal with prejudice to reflect that the dismissal of Count Two for lack of ripeness is without prejudice. *Cf. United States v. Watlington*, 381 F. App'x 309 (4th Cir. 2010).