**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 19-2355**

GREGORY BUSCEMI; KYLE KOPITKE; WILLIAM CLARK,

Plaintiffs - Appellants,

v.

KAREN BRINSON BELL, in her official capacity as Executive Director of the
North Carolina State Board of Elections,

Defendant - Appellee.

Appeal from the United States District Court for the Eastern District of North Carolina, at
Wilmington.  Terrence W. Boyle, Chief District Judge.  (7:19-cv-00164-BO)

Submitted:  May 18, 2020                                Decided:  July 6, 2020

Before MOTZ, KEENAN, and HARRIS, Circuit Judges.

Affirmed as modified by published opinion.  Judge Keenan wrote the opinion, in which
Judge Motz and Judge Harris joined.

Alan P. Woodruff, LAW OFFICES OF ALAN WOODRUFF, Southport, North Carolina,
for Appellant.  Joshua H. Stein, Attorney General, Paul M. Cox, Special Deputy Attorney
General, Nicholas S. Brod, Assistant Solicitor General, NORTH CAROLINA
DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for Appellee.

BARBARA MILANO KEENAN, Circuit Judge:

To regulate its elections and the placement of candidates' names on election ballots, North Carolina has established certain qualification requirements for candidates not affiliated with a political party (unaffiliated candidates) and for candidates whose names are not printed on the ballot (write-in candidates). *See* N.C. Gen. Stat. §§ 163-122, -123.[1] Unaffiliated candidates who wish to have their names appear on the general election ballot in North Carolina must (1) be "qualified voter[s]," (2) collect a certain number of signatures of other qualified voters, and (3) submit those signatures to the state Board of Elections by the date of the primary election. *Id.* § 163-122(a). Write-in candidates also must collect a minimum number of voters' signatures before the general election, and any votes cast for a write-in candidate who has failed to collect the required number of signatures will not be counted. *Id.* § 163-123.

The plaintiffs, two unaffiliated candidates and one voter seeking to cast votes for write-in candidates, argue that these requirements violate their First and Fourteenth Amendment rights. The district court dismissed the complaint for failure to state a claim. The court concluded that the challenged requirements impose only a modest burden on the rights of candidates and voters, which is justified by the state's important interest in regulating elections.

Upon our review, we hold that the plaintiffs lack standing to challenge two requirements at issue, namely, that an unaffiliated candidate be a "qualified voter" and that

---

[1] The North Carolina statutes at issue were recodified after the complaint was filed. We cite the current versions of the relevant state statutes.

a write-in candidate submit a certain number of signatures before votes cast for that write-in candidate will be counted. And, although two plaintiffs have standing to challenge North Carolina's signature requirements and filing deadline for unaffiliated candidates, we agree with the district court that these election laws impose only a modest burden that is justified by the state's interest in regulating elections. We therefore affirm the district court's judgment dismissing the plaintiffs' claims, relying in part on different reasons than those expressed by the district court.

I.

We begin with an overview of the North Carolina election laws that are material to this case. To be placed on the general election ballot as a candidate for public office, an unaffiliated candidate must satisfy three requirements. *See* N.C. Gen. Stat. § 163-122. First, the candidate must be a "qualified voter" (the qualified voter requirement). *Id.* § 163-122(a). Although the statute does not define the term "qualified voter," the plaintiffs allege in their complaint that the term refers to a person who lives, and is registered to vote, in North Carolina.

Second, an unaffiliated candidate must collect a minimum number of signatures from individuals who are qualified to vote for a given office. *See id.* § 163-122(a)(1)-(2). An unaffiliated candidate in a statewide election, including an election for President of the United States, must collect the signatures of at least 1.5% of the total number of voters who voted in the last gubernatorial election. *Id.* § 163-122(a)(1). An unaffiliated candidate in a districtwide election, including an election for the United States House of

3

Representatives, must collect the signatures of at least 1.5% "of the total number of registered voters in the district." *Id.* § 163-122(a)(2). Third, an unaffiliated candidate must submit these signatures by the date of the primary election, which this year was held on March 3, 2020. *Id.* §§ 163-1(b), -122(a)(1)-(2), -213.2.

Write-in candidates for public office in North Carolina face different requirements. *See id.* § 163-123. Among those requirements, the state only will count votes cast for candidates who have collected a certain number of voter signatures before the general election (the write-in candidate signature requirement). *Id.* § 163-123(f). These numerical requirements fall in a range between 100 and 500 signatures, depending on the office at issue. *Id.* § 163-123(c).

Three individuals initiated the present case in the district court. Plaintiff Kyle Kopitke is a Michigan resident seeking placement on the 2020 general election ballot in North Carolina as an unaffiliated candidate for President of the United States. Plaintiff Gregory Buscemi is a North Carolina resident seeking placement on the same ballot as an unaffiliated candidate for the United States House of Representatives. And finally, plaintiff William Clark is a North Carolina resident who wishes to cast votes for write-in candidates for every office in North Carolina's general election.

Kopitke, Buscemi, and Clark (collectively, the plaintiffs) filed a complaint in the district court under 42 U.S.C. § 1983 against Karen Bell, in her official capacity as the Executive Director of the North Carolina State Board of Elections (the Board). The complaint contained three main allegations. First, Kopitke and Buscemi alleged that the signature requirements and the filing deadline for unaffiliated candidates place an

4

unconstitutional burden on their First and Fourteenth Amendment rights. Next, Kopitke asserted separately that the qualified voter requirement violates the Constitution by effectively barring out-of-state residents from running for federal office. *See* U.S. Const. art. II, § 1, cl. 5; *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 805 (1995). Finally, Clark alleged that the signature requirement for write-in candidates places an unconstitutional burden on Clark's right to vote.

The plaintiffs moved for a preliminary injunction, asking the district court to enjoin the Board from enforcing the challenged requirements and to direct the Board to include Kopitke and Buscemi on the November 2020 general election ballot. In response, the Board moved to dismiss the case for lack of jurisdiction and for failure to state a claim. The district court granted the Board's motion to dismiss. The court held that the plaintiffs had standing but had failed to state a valid claim. Because the court found that the plaintiffs could not succeed on the merits of their claims, the court also denied the plaintiffs' motion for a preliminary injunction. The plaintiffs now appeal from the district court's dismissal of their electoral law challenges; they have not appealed the court's denial of their request for injunctive relief.

## II.

We begin with the question whether the plaintiffs have standing to bring their claims. Although typically we will not address issues raised by an appellee that has not filed a cross-appeal, *see Am. Roll-On Roll-Off Carrier, LLC v. P & O Ports Balt., Inc.*, 479 F.3d 288, 295-96 (4th Cir. 2007), we must assure ourselves of subject matter jurisdiction

5

and may address standing sua sponte,[2] *see Benham v. City of Charlotte*, 635 F.3d 129, 134 (4th Cir. 2011). Accordingly, we review de novo the legal question whether a plaintiff has standing to bring a claim. *South Carolina v. United States*, 912 F.3d 720, 726 (4th Cir. 2019). In making this assessment, we accept all allegations in the complaint as true and construe those allegations "in the light most favorable to the plaintiff." *Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 208 (4th Cir. 2017).

Article III of the Constitution provides that federal courts may consider only "[c]ases" and "[c]ontroversies." U.S. Const. art. III, § 2. To establish an injury sufficient to confer standing to bring suit under Article III, a plaintiff must plausibly allege: (1) "an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). These requirements for standing ensure that the plaintiff has "a personal stake in the outcome of the controversy." *Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018) (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)). In the present case, we focus on the first and third requirements for Article III standing, namely, injury in fact and redressability.

First, the plaintiff's "injury in fact" must be "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (internal quotation marks and citations omitted). The "threatened injury must be certainly impending," and "[a]llegations of possible future injury" are

---

[2] In its response brief, the Board argues that the plaintiffs lack standing, but has not filed a cross-appeal on that basis.

6

insufficient. *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990) (internal quotation marks and citation omitted). An injury "reli[ant] on a highly attenuated chain of possibilities[] does not" qualify as being "certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013).

When a plaintiff challenges the constitutionality of a statute, the plaintiff must show that "there is a 'realistic danger' that" the plaintiff "will 'sustain[] a direct injury' as a result of the terms of the" statute. *Curtis v. Propel Prop. Tax Funding, LLC*, 915 F.3d 234, 241 (4th Cir. 2019) (alteration in original) (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)). "[A] credible threat of enforcement is critical" to establishing an injury in fact. *Abbott v. Pastides*, 900 F.3d 160, 176 (4th Cir. 2018). And prior enforcement of the challenged statute is "[t]he most obvious way to demonstrate a credible threat of enforcement in the future." *Id.*

Next, regarding redressability, a plaintiff must show that the court has the power to grant the plaintiff's requested relief, and that such relief would redress the plaintiff's injury. *See K.C. ex rel. Africa H. v. Shipman*, 716 F.3d 107, 116-17 (4th Cir. 2013) (concluding that the appellant's injury was not redressable, because the Court was "powerless to provide the very relief" the appellant requested, namely, reversing a preliminary injunction directed against both the appellant and a non-appealing party); *see also Franklin v. Massachusetts*, 505 U.S. 788, 802-03 (1992) (plurality opinion); *M.S. v. Brown*, 902 F.3d 1076, 1083 (9th Cir. 2018) ("[T]here is no redressability if a federal court lacks the power to issue [the plaintiff's requested] relief."). When determining the scope of a "court's remedial power," "we assume that [a] claim has legal merit." *M.S.*, 902 F.3d at 1083

7

(citation omitted); *see White Tail Park, Inc. v. Stroube*, 413 F.3d 451, 460-61 (4th Cir. 2005). With these principles in mind, we turn to address each of the plaintiffs' claims.

## A.

We look first to whether Michigan resident and aspiring presidential candidate Kopitke has alleged a sufficiently concrete injury to challenge the qualified voter requirement. Kopitke argues that North Carolina General Statute § 163-122(a), which requires that an unaffiliated candidate be a "qualified voter," is unconstitutional as applied to his candidacy for the presidency. Although the statute does not define the term "qualified voter," *see id.* § 163-122, Kopitke alleges that a "qualified voter" is an individual "who satisfies the statutory requirements to vote in North Carolina and has registered to vote." Kopitke is registered to vote in Michigan and, thus, maintains that he is not a "qualified voter" who can satisfy the requirements for being placed on the ballot as an unaffiliated candidate for President. Kopitke accordingly contends that the qualified voter requirement conflicts with the candidacy requirements for federal office enumerated in the Constitution. *See* U.S. Const. art. II, § 1, cl. 5; *U.S. Term Limits, Inc.*, 514 U.S. at 805.

In response, the Board agrees that if Kopitke's definition of "qualified voter" is accurate, the statute would be unconstitutional because states may not impose requirements on candidates for federal office other than those mandated by the Constitution. However, the Board submits that the term "qualified voter," as used in Section 163-122(a), is not limited only to voters registered to vote in North Carolina. And the Board further contends

that Kopitke lacks standing,[3] because the Board never has enforced the qualified voter requirement to exclude unaffiliated candidates from appearing on the ballot due to their nonresident status.

We agree with the Board that Kopitke lacks standing to challenge the qualified voter requirement as applied to him, because he has failed to allege "a credible threat of enforcement." *Abbott*, 900 F.3d at 176. The Board has stipulated that it has not prevented, and will not prevent, Kopitke from appearing on the ballot because of his nonresident status. The Board already has accepted Kopitke's request for a petition to collect voters' signatures, despite his nonresident status. And, crucially, Kopitke has not alleged that the Board ever has interpreted the qualified voter requirement to exclude nonresident, unaffiliated presidential candidates. To the contrary, Ross Perot, an unaffiliated candidate for President in 1992, appeared on North Carolina's general election ballot, although he was not a North Carolina resident. Given this history, as well as the Board's present assurances that it will not enforce such a requirement against Kopitke, Kopitke has failed to allege "a credible threat of enforcement" to demonstrate standing to challenge the qualified voter requirement. *Abbott*, 900 F.3d at 176. Thus, we conclude that Kopitke lacks standing to assert this claim.

---

[3] The Board did not challenge Kopitke's standing to pursue this claim in the district court, and the court did not address this issue. Instead, the court credited the Board's assertion that individuals other than North Carolina residents may run for federal office as unaffiliated candidates, and dismissed Kopitke's claim. We ordered supplemental briefing addressing the question whether Kopitke has standing to challenge the qualified voter requirement.

9

B.

Next, we consider whether Clark, a registered voter who wishes to cast his votes for write-in candidates, has standing to challenge the signature requirement for such candidates. Under North Carolina General Statute § 163-123, only write-in candidates who have collected a certain number of voter signatures will be approved to have their votes counted. Clark argues that this requirement infringes on his constitutional rights generally, and suggests that he has a right to cast a "protest vote" that will be counted.

We conclude that Clark lacks standing to advance this claim. Clark's generalized allegation of harm is too speculative to constitute an "actual or imminent" injury necessary to confer Article III standing. *Lujan*, 504 U.S. at 560. Notably, Clark does not allege that he wishes to vote for any particular write-in candidates who have failed to secure the required number of signatures. Nor does Clark allege that votes he previously cast were not counted because he voted for specific write-in candidates who failed to comply with state law requirements. Thus, Clark's claim of injury fails because it depends on the speculative proposition that he may wish to support yet unknown candidates who might fail to secure the number of signatures required by Section 163-123.

Our conclusion that Clark lacks standing is not affected by the Supreme Court's decision in *Burdick v. Takushi*, 504 U.S. 428 (1992). There, the Supreme Court addressed the merits of a plaintiff's claim that his inability to cast a "'protest vote' for Donald Duck" infringed on his right to vote. *Id.* at 438. The plaintiff in *Burdick* had standing to make that claim because Hawaii had banned all write-in votes and, thus, the plaintiff's vote for Donald Duck would not be counted. *Id.* at 430, 432. In rejecting the merits of the plaintiff's

10

claim, the Court explained that the plaintiff's right to vote was unaffected because a "protest vote" is not cast for the purpose of electing a candidate, but merely "to voice . . . generalized dissension from the electoral process." *Id.* at 441.

Unlike the plaintiff in *Burdick*, Clark has not alleged that all write-in votes will not be counted. And, based on the allegations in his complaint, Clark ultimately may cast his votes for candidates who have complied with the write-in candidate signature requirement, eliminating any claimed injury.[4] Therefore, we conclude that Clark's alleged injury is too speculative to constitute an "actual or imminent" injury in fact to establish standing. *Lujan*, 504 U.S. at 560. Accordingly, we conclude that Clark has failed to plead sufficient facts to establish standing.

Dismissal for lack of standing, however, requires that a complaint be dismissed without prejudice because a court that lacks jurisdiction necessarily lacks the "power to adjudicate and dispose of a claim on the merits." *S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 185 (4th Cir. 2013). Accordingly, we affirm the district court's judgment, but modify the dismissal of Clark's claim and Kopitke's "qualified voter" claim to reflect a dismissal without prejudice. *See Moore v. Frazier*, 941 F.3d 717, 725 (4th Cir. 2019) ("[W]e can affirm [the district court's] decision to dismiss the complaint on any ground apparent on the record."); *Thomas v.*

---

[4] Because Clark does not allege a past injury, we need not address his reliance on our decision in *Dixon v. Md. State Admin. Bd. of Election Laws*, 878 F.2d 776 (4th Cir. 1989), *abrogated in part by Burdick*, 504 U.S. at 432. The plaintiffs in *Dixon* had suffered the injury of having their write-in votes rejected, *id.* at 778, whereas Clark's injury may never occur.

11

*Salvation Army S. Territory*, 841 F.3d 632, 642 (4th Cir. 2016) (modifying a judgment to reflect a dismissal without prejudice).

C.

We next consider the claims of Kopitke and Buscemi challenging North Carolina's signature requirements and filing deadline for unaffiliated candidates. They seek a court order directing the Board to place their names on the general election ballot without meeting any signature requirement or filing deadline, contending that a lesser signature requirement and a later filing date would be inadequate remedies for their injuries.

As an initial matter, we reject the Board's contention that the plaintiffs lack standing to assert these claims. Contrary to the Board's contention, the asserted injuries are redressable, because the district court has the power to grant the relief sought.[5] It is well-settled that a court has equitable authority to order that a candidate's name be placed on an election ballot. *See McCarthy v. Briscoe*, 429 U.S. 1317, 1322-23 (1976); *Williams v. Rhodes*, 393 U.S. 23, 34-35 (1968). Although a court should consider whether a candidate has "community support" before ordering that the candidate's name be added to a ballot, the court has broad equitable authority to order such relief. *McCarthy*, 429 U.S. at 1323. The appropriateness of any remedy will be decided after a determination of the merits of the claim. *See id.* at 1322-23; *Williams*, 393 U.S. at 34-35. Accordingly, regardless

---

[5] We agree with the parties that, with respect to these claims, Kopitke and Buscemi have satisfied the other two requirements for standing, namely, that they have alleged injuries in fact, and that their injuries are traceable to the Board's conduct.

whether Kopitke and Buscemi ultimately obtain relief on the merits, we conclude that their injuries are redressable for purposes of establishing standing.

Addressing the merits of their claims, Kopitke and Buscemi contend that North Carolina's signature requirements and filing deadline for unaffiliated candidates place an unconstitutionally severe burden on their First and Fourteenth Amendment rights to run for office. Conceding that they cannot meet any reduced signature requirement by any date, they contend that the signature requirement of 1.5% of the relevant voter population is too high, and that the filing deadline on the date of the primary election is too early. They argue that the Board has failed to advance precise state interests that would justify imposition of these burdens.

In response, the Board contends that the challenged requirements for unaffiliated candidates impose only a modest burden, because courts have upheld higher signature requirements and equivalent filing deadlines. According to the Board, this modest burden is justified by the state's important regulatory interest in preventing ballot overcrowding. We agree with the Board's position.

We review de novo a district court's ruling on a motion to dismiss for failure to state a claim.[6] *McCaffrey v. Chapman*, 921 F.3d 159, 163 (4th Cir. 2019). In conducting our analysis, we construe all "facts in the light most favorable to the plaintiff[s]." *Id.* at 164 (citation omitted).

---

[6] The plaintiffs argue that the district court improperly treated the motion to dismiss as a motion for summary judgment by addressing the merits of the plaintiffs' claims. We disagree with the plaintiffs' assessment of the record and conclude that the district court applied the correct standard for a motion to dismiss.

13

We begin with a review of the relevant legal principles. Any restrictions on access to the ballot necessarily "implicate substantial voting, associational[,] and expressive rights protected by the First and Fourteenth Amendments." *McLaughlin v. N.C. Bd. of Elections*, 65 F.3d 1215, 1221 (4th Cir. 1995). However, states have the power to regulate the time, place, and manner of their own elections, *see* U.S. Const. art. 1, § 4, cl. 1, to ensure that "some sort of order, rather than chaos, . . . accompan[ies] the democratic processes," *Burdick*, 504 U.S. at 433 (quoting *Storer v. Brown*, 415 U.S. 724, 730 (1974)). Accordingly, in evaluating a challenge to a ballot-access law, courts

> must weigh the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate against the precise interests put forward by the State as justifications for the burden imposed by its rule, taking into consideration the extent to which those interests make it necessary to burden the plaintiff's rights.

*Id.* at 434 (citation omitted).

When election laws "impose a severe burden on ballot access," those laws "are subject to strict scrutiny," and will be upheld only if the laws are "narrowly drawn" to support a compelling state interest. *Pisano v. Strach*, 743 F.3d 927, 933 (4th Cir. 2014) (citation omitted). Election laws that impose only a "modest" burden will be upheld if the state can "articulate" its "important regulatory interests." *Libertarian Party of Va. v. Alcorn*, 826 F.3d 708, 716, 719 (4th Cir. 2016) (citations omitted). A "state's important regulatory interests are generally sufficient to justify reasonable, nondiscriminatory restrictions." *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983). "When deciding whether

14

a state's filing deadline is unconstitutionally burdensome, we evaluate the combined effect of the state's ballot-access regulations." *Pisano*, 743 F.3d at 933.

In *Pisano,* we upheld a North Carolina law requiring a group of voters seeking to establish a new political party (1) to obtain signatures of at least 2% of the total number of voters who voted in the last gubernatorial election, and (2) to meet this requirement by mid-May, one week after the state's primary election. *Id.* at 929-30. We held that, when viewed together, these two requirements were permissible because they imposed only a "modest" burden on ballot access. *Id.* at 936. In explaining our decision, we drew a distinction "between filing deadlines [occurring] well in advance of the primary and general elections[,] and deadlines falling closer to the dates of those elections," and noted that courts more often have invalidated filing deadlines that well precede the state's primary election. *Id.* at 935 (citation omitted). With these principles in mind, we turn to address the parties' arguments.

i.

We first address the challenges brought by Kopitke and Buscemi to the filing deadline for unaffiliated candidates. North Carolina's filing deadline for unaffiliated candidates was March 3, 2020, the date of the primary election. N.C. Gen. Stat. §§ 163-1(b), -122(a)(1)-(2), -213.2. We evaluate the appropriateness of a filing deadline in relation to the date of the primary election. *See Pisano*, 743 F.3d at 935. The March filing deadline at issue here fell early in the calendar year, but the deadline was not "well in advance of the primary [election]." *Id.* Instead, the March filing deadline ensured that unaffiliated

15

candidates in North Carolina were able "to engage voters during the height of the primary season" when voters had greater awareness of the upcoming election. *Id.*

Although a filing deadline on the day of a primary election may place a burden on unaffiliated candidates who decide to run after the primary has occurred, *see Lawrence v. Blackwell*, 430 F.3d 368, 373 (6th Cir. 2005) (upholding a signature filing deadline for unaffiliated candidates the day before the March primary election), the Supreme Court has placed "little weight" on "the interest the candidate . . . may have in making a late rather than an early decision to seek independent ballot status." *Id.* (quoting *Storer*, 415 U.S. at 736). Accordingly, under the circumstances presented, we conclude that North Carolina's filing deadline posed only a modest burden on unaffiliated candidates and that, therefore, the district court did not err in holding that Kopitke and Buscemi failed to state a claim on this basis. *See Wood v. Meadows*, 207 F.3d 708, 712 (4th Cir. 2000) (upholding Virginia's requirement that independent candidates file petitions on primary election day).

ii.

Next, we consider North Carolina's requirement that unaffiliated candidates for statewide office obtain the signatures of at least 1.5% of voters who voted in the last gubernatorial election. N.C. Gen. Stat. § 163-122(a)(1). We also consider the requirement that unaffiliated candidates for districtwide office obtain the signatures of 1.5% of registered voters in that district. *Id.* § 163-122(a)(2).

Such signature requirements generally are justified by the "important state interest in requiring some preliminary showing of a significant modicum of support before printing" a candidate's name on the ballot. *Jenness v. Fortson*, 403 U.S. 431, 442 (1971).

16

The Supreme Court has held that requiring unaffiliated candidates to submit petitions with "signatures equal in number to 3% or 5% of the vote in the last election is not invalid on its face." *Am. Party of Tex. v. White*, 415 U.S. 767, 789 (1974); *see also Jenness*, 403 U.S. at 438-39 (upholding statute requiring unaffiliated candidates to collect signatures of at least 5% of registered voters for the candidates' names to be placed on the ballot). And, as discussed above, we recently upheld a 2% signature requirement for new political parties in *Pisano*, 743 F.3d at 929-30. Because North Carolina's 1.5% signature requirement falls below these acceptable thresholds, the state's signature requirement by itself does not constitute a severe burden. *See White*, 415 U.S. at 789.

The present election format includes several of the same "alleviating factors" that we relied on in *Pisano* in concluding that the ballot-access laws at issue were only modestly burdensome. 743 F.3d at 934. For example, both new political parties and unaffiliated candidates for statewide office can begin collecting signatures after the previous gubernatorial election, a time period that provides those candidates more than three years to accomplish this task. *See* N.C. Gen. Stat. §§ 163-96(a)(2), -122(a)(1); *Pisano*, 743 F.3d at 930, 934. Also, voters in North Carolina may sign a candidate's petition regardless of the voters' party affiliation and may sign multiple petitions. *Pisano*, 743 F.3d at 930, 934-35. These liberal requirements set by North Carolina support a conclusion that the state's election format poses only a modest burden on unaffiliated candidates.

Notably, the challenged restrictions contain none of the additional requirements that prompted us in 1995, in our decision in *McLaughlin,* to label North Carolina's prior election scheme as severely burdensome. 65 F.3d at 1221. There, the Libertarian Party of

North Carolina challenged the statutory requirement that a political party must receive at least 10% of the votes cast in the previous election to retain its status as an established political party. *Id.* at 1219-20. Under that provision, if a party failed to receive the required number of votes in the previous election, the party had to become certified again as a new political party by submitting a petition with signatures of at least 2% of voters. *Id.* at 1219. At that time, North Carolina law also required the petitioner to submit a notarized affidavit and a verification fee accompanying each signature. *Id.* at 1218. We categorized these election requirements existing before *Pisano* as severe burdens. *Id.* at 1221. None of these former requirements presently constrain unaffiliated candidates seeking ballot placement in North Carolina. *See* N.C. Gen. Stat. § 163-122; *see also Pisano*, 743 F.3d at 934.

Kopitke and Buscemi argue, nevertheless, that the current 1.5% signature requirements for unaffiliated candidates impose a severe burden when considered in comparison to the current .25% signature requirement for new political parties. *Compare* N.C. Gen. Stat. § 163-122(a)(1)-(2), *with* § 163-96(a)(2). This comparison is unavailing because it essentially asks us to compare apples to oranges. The attempt to form a new political party and the act of seeking office as an unaffiliated candidate "are entirely different" endeavors. *Storer*, 415 U.S. at 745. A new political party "contemplates a statewide, ongoing organization with distinctive political character," *id.*, whereas an unaffiliated candidate merely seeks election for one office.

Because of these differences, a group of voters seeking recognition as a new political party must satisfy additional requirements to attain and retain such recognition. *See* N.C. Gen. Stat. § 163-96. For example, new political parties must "inform the signers of the

18

general purpose and intent of the new party." *Id.* § 163-96(b). Also, candidates of a new political party must receive at least 2% of the vote in the next general election or the party will be terminated. *Id.* §§ 163-96(a)(1), -97. These additional burdens on new political parties help explain why new political parties have an initial signature requirement lower than the signature requirement for an unaffiliated candidate. And, despite these additional burdens, we approved a 2% signature requirement for new political parties in our decision in *Pisano*, 743 F.3d at 929-30.

We conclude that, taken together, the present filing deadline and signature requirements pose only a modest burden on unaffiliated candidates. As we stated in *Pisano*, "[e]lection law schemes with modest signature requirements and filing deadlines falling close to or after the primary election . . . do not impose severe burdens."[7] *Id.* at 935; *see also Swanson v. Worley*, 490 F.3d 894 (11th Cir. 2007) (upholding election scheme as not severely burdensome when it required unaffiliated candidates to file a petition with signatures of at least 3% of qualified voters by its primary election date). Therefore, we do not apply strict scrutiny, and instead ask whether the Board has articulated an "important regulatory interest[]" to justify the modest burden.[8] *Pisano*, 743 F.3d at 933.

---

[7] This Court in *Wood* held open the possibility that "a filing deadline for independent candidates on the day of the party primaries could pose an unconstitutional burden when operating in conjunction with a very early primary date, very high signature requirements, or other particularly burdensome provisions." 207 F.3d at 713. However, as discussed above, the March 3, 2020 primary date is not "very early," the 1.5% signature requirement is not "very high," and there are no "other particularly burdensome provisions." *Id.*

[8] To the extent that the plaintiffs argue that this election scheme is not necessary to satisfy the state's interests, the plaintiffs apply the wrong standard of review. The Board

The requirement that states articulate their asserted regulatory interests "is not a high bar." *Alcorn*, 826 F.3d at 719. The Supreme Court has "expressly approved a state's interest in limiting the number of candidates on the ballot . . . and in conditioning ballot access on a showing of a modicum of support among the potential voters for the office." *Wood*, 207 F.3d at 715.[9] Similarly, we have upheld "the important state interest of reducing voter confusion." *Alcorn*, 826 F.3d at 719. Under this precedent, the Board's stated interests in preventing ballot overcrowding and voter confusion easily constitute important regulatory interests sufficient to justify the modest burden of the state's election scheme.[10] Accordingly, the Board adequately has articulated its interests in protecting the integrity of its elections, and we affirm the district court's judgment that Kopitke and Buscemi failed to state a claim regarding the election law signature requirements for unaffiliated candidates.

## III.

In summary, we hold that Kopitke lacks standing to challenge North Carolina's "qualified voter" requirement, and that Clark lacks standing to challenge the signature

---

is not required to show that less restrictive means could advance its interests. *See Wood*, 207 F.3d at 716-17.

[9] Citing *Munro v. Socialist Workers Party*, 479 U.S. 189, 193 (1986); *Anderson*, 460 U.S. at 788 n.9; *Lubin v. Panish*, 415 U.S. 709, 714-15 (1974); *Bullock v. Carter*, 405 U.S. 134, 145 (1972); *Jenness*, 403 U.S. at 442; *Williams*, 393 U.S. at 32-34.

[10] Although "a state has a less important interest in regulating Presidential elections than statewide or local elections, . . . states maintain an interest in regulating presidential elections." *Pisano*, 743 F.3d at 937 (citation omitted).

requirement for write-in candidates.  Although we conclude that Kopitke and Buscemi have standing to challenge North Carolina's election law signature requirements for unaffiliated candidates, we hold that they have failed to state a claim challenging those requirements, which impose only a modest burden advancing important regulatory interests. Accordingly, we affirm the district court's order dismissing this action, but modify the dismissal of Clark's claim and Kopitke's "qualified voter" claim to reflect a dismissal without prejudice.

*AFFIRMED AS MODIFIED*[*]

---

[*] This opinion is published without oral argument pursuant to this Court's Standing Order 20-01, www.ca4.uscourts.gov/docs/pdfs/amendedstandingorder20-01.pdf (amended Apr. 7, 2020).