**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

―――――――――

**No. 24-6691**

―――――――――

THOMAS SHEPPHEARD; TYLER RANDALL; ADAM PERRY, next friend and guardian of Minor child; J. P., on their own behalf and on behalf of all others similarly situated,

Plaintiffs – Appellants,

v.

PATRICK MORRISEY, in his official capacity as Governor of the State of West Virginia; ROB CUNNINGHAM, in his official capacity as the Acting Cabinet Secretary of the West Virginia Department of Homeland Security,

Defendants – Appellees.

―――――――――

Appeal from the United States District Court for the Southern District of West Virginia, at Beckley.  Irene C. Berger, District Judge.  (5:23-cv-00530)

―――――――――

Argued:  March 18, 2025                                    Decided:  July 9, 2025

―――――――――

Before WILKINSON and RUSHING, Circuit Judges, and Jasmine H. YOON, United States District Judge for the Western District of Virginia, sitting by designation.

―――――――――

Affirmed by published opinion.  Judge Yoon wrote the opinion, in which Judge Wilkinson and Judge Rushing joined.

―――――――――

**ARGUED:**  Stephen Paul New, STEPHEN NEW & ASSOCIATES, Beckley, West Virginia, for Appellants.  Jonathan Zak Ritchie, HISSAM FORMAN DONOVAN RITCHIE PLLC, Charleston, West Virginia; Natalie C. Schaefer, SHUMAN,

MCCUSKEY SLICER PLLC, Charleston, West Virginia, for Appellees. **ON BRIEF:** Timothy P. Lupardus, LUPARDUS LAW OFFICE, LC, Pineville, West Virginia, for Appellants.  Michael B. Hissam, Maureen Gleason, HISSAM FORMAN DONOVAN RITCHIE PLLC, Charleston, West Virginia, for Appellee Patrick Morrisey.  Caleb B. David, Kimberly M. Bandy, SHUMAN MCCUSKEY SLICER PLLC, Charleston, West Virginia, for Appellee Rob Cunningham.

YOON, District Judge:

Plaintiffs-Appellants Thomas Sheppheard, Tyler Randall, and Adam Perry, the next friend and guardian of minor child, J.P., filed a "Class Action Complaint for Declaratory and Injunctive Relief" against Defendants-Appellees Governor James C. Justice, Jr. and Secretary of the West Virginia Department of Homeland Security Mark Sorsaia.[1] *See* J.A. 5, 16–43. Appellants named the Governor and the Secretary in their official capacities. J.A. 18–19. Appellants, on behalf of all currently incarcerated persons housed in state prison facilities, jail facilities, and juvenile centers in West Virginia, sought relief under the Eighth and Fourteenth Amendments. J.A. 16. In particular, they wished "to ensure that prisons, jails, and juvenile centers in West Virginia promptly alleviate the pervasive and unconstitutional conditions of overcrowding, understaffing, and deferred maintenance." J.A. 17. According to Appellants, those issues amounted to violations of the federal constitution as the conditions of confinement demonstrate deliberate indifference. *Id.*

Appellants challenge the district court's dismissal of their case based on lack of standing. As explained below, we affirm the dismissal based on Appellants' failure to establish two elements of Article III standing—traceability and redressability.

---

[1] While this appeal was pending and following notice from Appellees, the court substituted Patrick Morrisey for James C. Justice, Jr., and Rob Cunningham for Mark Sorsaia. *See* Fed. R. App. P. 43(c)(2).

3

I.

Appellants each resided in a different type of West Virginia state facility at issue in the action. J.A. 17–18. Sheppheard was incarcerated at Mt. Olive Correctional Complex—a prison. J.A. 17. Randall was incarcerated at Southwestern Regional Jail—a jail. *Id.* And finally, J.P. was incarcerated at Donald R. Kuhn Juvenile Center—a juvenile detention center. J.A. 18.

Although Appellants alleged that "[t]he Legislature of West Virginia is empowered to appropriate . . . funds," they did not include the state legislature as a party in the suit. *Id.* Instead, they named the Governor as a defendant based on his "executive authority and responsibility for the administration, operation, and control" of all West Virginia correctional facilities and employees. J.A. 19. Appellants also named the Secretary as a co-defendant because he is in charge of "providing support, oversight, and guidance to the West Virginia Division of Corrections and Rehabilitation" ("WVDCR"). J.A. 18.

Appellants contend that they were subjected to inhumane living conditions through "[o]vercrowding, understaffing, and deferred maintenance," which "all have an impact on safety." J.A. 21. As to overcrowding, Appellants alleged that "[o]vercrowding makes a facility less safe, secure, and humane than it could be." J.A. 26. As to understaffing, Appellants alleged that the Governor previously issued an Executive Order stating that "any shortage of correctional officers limits the ability to properly supervise the State's incarcerated individuals" and that the lack of proper supervision presents a danger to those in the facility. J.A. 22. Finally, as to deferred maintenance, Appellants alleged that the facilities were in "serious need of maintenance" and that funding of more than $270 million

4

is needed to correct those issues. J.A. 26–27. Appellants added that doors, locks, and door locking control systems, which are particularly critical items of deferred maintenance, required $27 million in funding. J.A. 28.

Moreover, Appellants alleged that West Virginia ended fiscal year 2023 with a $1.8 billion budget surplus. J.A. 29. While roughly $1.2 billion of that surplus was appropriated, none was designated to rectify the allegedly unconstitutional conditions in at-issue facilities. J.A. 30. Appellants claimed that the Governor and legislature "have yet to mention to the public a detailed plan for tackling $277 million on deferred maintenance." *Id*.

The complaint asserted three putative classes. The first class consisted of individuals in prison facilities in West Virginia and Sheppheard was the class representative. J.A. 31–34. In addition to alleging overcrowding, understaffing, and deferred maintenance, Sheppheard alleged that he was given inadequate portions of food, only had access to water that was too hot for showering, did not have regular access to new toothbrushes or toothpaste, and did not have access to a law library or recreation time. J.A. 34. The second class consisted of individuals in jail facilities in West Virginia and Randall was the class representative. J.A. 34, 36. Randall claimed that he has observed inmates sleeping on the ground, has been exposed to mold and rodent feces, and has been given inadequate portions of food. J.A. 36. The third class consisted of all currently incarcerated minor individuals in juvenile center facilities in West Virginia and J.P. was the class representative. J.A. 36–38. He additionally claimed that he was served undercooked food and did not always have access to hot water. J.A. 39.

5

The complaint asserted a single cause of action for a violation of the Appellants' Eighth Amendment rights under 42 U.S.C. § 1983. J.A. 39–40. The claim alleges that the Governor and the Secretary have been "deliberately indifferent to the health, safety, and other basic needs of [Appellants] . . . by having actual knowledge of such conditions and deliberately taking no action to remedy them in a timely or appropriate manner." J.A. 39.

Appellants sought declaratory and injunctive relief. They asked the court to:

a) Certify a class . . . of all individuals currently incarcerated at any correctional facility within the state of West Virginia;

b) Declare . . . that Defendants' actions and/or inactions . . . violate the Eighth and Fourteenth Amendments to the United States Constitution;

c) Enjoin . . . Defendants from engaging in further unconstitutional practices . . . , and compel them to implement and enforce policies, procedures, and practices necessary to ensure the minimal civilized measure of life's necessities and/or the Constitutional thresholds of confinement are provided to all inmates housed in the states jails, correctional facilities, and juvenile centers;

d) Enjoin . . . Defendants from engaging in further unconstitutional practices . . . , and compel them to make all necessary structural and/or infrastructure repairs, hazard abatements, financial investments, and personnel changes/additions to ensure these constitutional deprivations cease and do not continue in the future;

e) Enjoin and compel . . . Defendants to spend state budget surplus funds (or submit bills, call for a special session, etc.) in order to make all of the necessary deferred maintenance repairs required at all West Virginia correctional facilities in an amount not less than 270 million dollars;

f) Enjoin and compel . . . Defendants to spend state budget surplus funds to hire and pay the requisite number of correctional staff needed to appropriately staff the facilities, not less than 60 million dollars;

g) Enjoin . . . Defendants from engaging in further unconstitutional practices . . . by the least intrusive means to correcting that harm with respect to all inmates housed in a West Virginia prison;

6

> h) Impose definite time limitations within which the Defendants and the State of West Virginia must comply with the injunction . . . .

J.A. 40–42.

Both the Governor and the Secretary moved to dismiss the complaint. *See* J.A. 112–16; J.A. 168–69. While both argued that Appellants lacked standing, they also asserted additional grounds for dismissal. The Secretary argued that Appellants' claims were subject to dismissal based on the Eleventh Amendment, mootness, the failure to exhaust administrative remedies, improper venue, the failure to state a claim against the Secretary upon which relief may be granted, the political question doctrine, and the Tenth Amendment. J.A. 141–65. For the Governor's part, he also argued that Appellants' claims were subject to dismissal because of state sovereign immunity and the failure to state a claim against the Governor upon which relief may be granted. J.A. 170–188.

On July 2, 2024, the district court granted both the Governor's and the Secretary's motions to dismiss. J.A. 1470. The district court found that Appellants lacked standing because they could not establish that their injuries were "fairly traceable to either Defendant's conduct or that their injuries would be redressed by a favorable decision against either Defendant." J.A. 1459. As a result, the district court dismissed the complaint for lack of standing but did not address any of the alternative grounds for dismissal that the Governor and the Secretary raised. J.A. 1468.

The district court first found that Appellants lacked standing to pursue their claims against the Secretary. J.A. 1462–64. While it acknowledged that the Secretary "is charged with providing support, oversight, and guidance" to the WVDCR, the district court found

7

that "general duty does not provide a sufficient 'causal connection' between the [Appellants'] alleged injuries and Secretary Sorsaia's conduct." J.A. 1462. The district court further noted that Appellants' alleged injuries are due in large part to funding decisions from the West Virginia legislature, not the Secretary. J.A. 1462–63. According to the district court, Appellants even acknowledged that legislative action is necessary to resolve the issues of deferred maintenance and overcrowding in state facilities. J.A. 1463.

Even were there a causal connection between Appellants' alleged injuries and the Secretary's conduct, the district court found that their injuries would not be redressable through a favorable decision against the Secretary. J.A. 1463–64. It noted that the Secretary's "budget authority extends only so far as '[f]ormulat[ing] comprehensive budgets for consideration by the Governor.'" J.A. 1463 (quoting W. Va. Code § 5F-2-2(a)(7)). While the Secretary maintains authority to enter into agreements and contracts, "such authority necessarily requires legislative approval." *Id.* The district court recognized that the legislature had vested a different official—the Commissioner of the WVDCR— "not only with general supervisory authority over the administration" of the facilities at issue, but also with the authority to establish rules, policies, and regulations governing the institutions. J.A. 1464. With authority vested to the Commissioner, the district court found it "speculative, at best, that an order enjoining [the Secretary] from engaging in unconstitutional practices and compelling him to . . . remedy understaffing and deferred maintenance would redress the [Appellants'] claimed injuries." *Id.*

The district court next found that Appellants lacked standing to sue the Governor for similar reasons. J.A. 1466. While Appellants pointed to the Governor's pardon and

8

budget powers as evidence of his direct control over the facilities, the district court held "neither is sufficient" to establish a causal connection between the Governor's general executive power and the remedy Appellants seek. J.A. 1466–67. Turning to the Governor's pardon power first, the district court found that as a "discretionary" power, the district court cannot control its exercise. Relying on *Ex parte Young*, the district court held that it can only direct affirmative action when an officer refuses or neglects to take some ministerial action arising from some duty. J.A. 1467 (citing 209 U.S. 123, 158 (1908)). As a result, the district court concluded that, to the extent Appellants suggest the Governor could remedy the overcrowding through the discretionary pardon power, it could not order such relief. *Id.*

The district court next found Appellants' reliance on a West Virginia Supreme Court of Appeals case—*State ex rel. Dodrill v. Scott*, 352 S.E.2d 741 (W. Va. 1986)—was misplaced. J.A. 1467–68. The district court noted that in *Dodrill*, two Executive Orders issued by the Governor, which attempted to alleviate overcrowding in facilities, were struck down because they conflicted with West Virginia statutes. J.A. 1467. That meant that "the Governor's 'only permissible course of action' was to exercise his discretionary pardon power." J.A. 1468. So, the district court found that *Dodrill* did not provide the court authority to order the Governor to perform such discretionary acts. *Id.*

The district court closed by noting that Appellants' complaint itself suggests that the state legislature and the Commissioner of the WVDCR may be the proper parties. *Id.* Because the district court found Appellants lacked standing, it did not address any of the remaining grounds for dismissal presented by Defendants. Accordingly, the district court

9

granted both the Secretary's and the Governor's motions to dismiss.  J.A. 1468, 1470.

Appellants filed a timely notice of appeal.  J.A. 1472.

## II.

## A.

Before turning to the arguments concerning the Governor and the Secretary, the court briefly reviews the traceability and redressability requirements of Article III standing.

### 1.

The court reviews the legal question of whether Appellants have standing to bring their claim *de novo*.  *South Carolina v. United States*, 912 F.3d 720, 726 (4th Cir. 2019). In making this assessment, the court accepts all allegations in the complaint as true and construes those allegations "in the light most favorable to the plaintiff[s]."  *Wikimedia Found. v. Nat'l Sec. Agency*, 857 F.3d 193, 208 (4th Cir. 2017).

### 2.

Article III of the U.S. Constitution confines the power of federal courts to adjudicate "actual cases or controversies."  *Raines v. Byrd*, 521 U.S. 811, 818 (1997) (quoting *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 37 (1976)); *see* U.S. Const. art III.  "A dispute is not a case or controversy if the plaintiff lacks standing."  *John & Jane Parents 1 v. Montgomery Cnty. Bd. of Educ.*, 78 F.4th 622, 628 (4th Cir. 2023).  The doctrine of standing "limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong" and ensures that federal courts do not exceed their constitutional authority.  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

Standing doctrine "is built on a single basic idea—the idea of separation of powers." *Allen v. Wright*, 468 U.S. 737, 752 (1984); *see also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559–60 (1992) (The "central mechanism of separation of powers depends largely upon common understanding of what activities are appropriate to legislatures, to executives, and to courts."). Accordingly, Article III standing prohibits federal courts from "exercis[ing] general legal oversight of the Legislative and Executive Branches, or of private entities," and prevents federal courts from becoming "roving commission[s] to publicly opine on every legal question." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423–24 (2021).

To establish Article III standing, "a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000). This case focuses on the second and third requirements: traceability and redressability.

The traceability requirement of standing "ensures that it is likely the plaintiff's injury was caused by the challenged conduct of the defendant, and not by the independent actions of third parties not before the court." *Friends for Ferrell Parkway, LLC v. Stasko*, 282 F.3d 315, 320 (4th Cir. 2002). Traceability does not require that a defendant's actions "be the sole or even immediate cause of [a plaintiff's] injury." *See Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 284 (4th Cir. 2018). However, traceability is not met when an injury results from "the independent action of some third party not before the

11

court." *Simon*, 426 U.S. at 41–42. When multiple actors are involved, a plaintiff can establish causation only if the defendant's conduct had a "determinative or coercive effect upon the action of someone else." *Bennett v. Spear*, 520 U.S. 154, 169 (1997).

The redressability requirement of standing ensures that the court has the power to grant the plaintiff's requested relief, and that such relief would remedy the plaintiff's injury. *Buscemi v. Bell*, 964 F.3d 252, 259 (4th Cir. 2020). "An injury is redressable if it is 'likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" *Doe v. Va. Dep't of State Police*, 713 F.3d 745, 755 (4th Cir. 2013) (quoting *Friends of the Earth, Inc.*, 528 U.S. at 181). An injury is not redressable if the court is "powerless to provide the very relief" the plaintiff requests. *K.C. ex rel. Africa H. v. Shipman*, 716 F.3d 107, 116–17 (4th Cir. 2013).

The burden of establishing standing falls to Appellants. *Lujan*, 504 U.S. at 561. Accordingly, at the motion to dismiss stage, Appellants "must clearly . . . allege facts demonstrating each element" of the standing analysis. *Spokeo*, 578 U.S. at 338 (internal quotation marks omitted). The standing inquiry must be evaluated separately as to each Defendant. *Disability Rts. S.C. v. McMaster*, 24 F.4th 893, 900 (4th Cir. 2022).

B.

1.

Appellants' injuries are not traceable to the action of the Governor. Consider the injuries alleged. Appellants assert that they were injured by living under unsafe and unsanitary conditions in their facilities due to understaffing, overcrowding, and deferred maintenance. J.A. 33–34, 36, 38–39. Appellants also complain of specific confinement

12

conditions including inadequate or undercooked food, limited access to hot water, law libraries, toothbrushes and toothpaste, and exposure to mold and rodent feces. J.A. 34, 36, 39.

But Appellants do little to explain how the Governor's action or inaction caused the injuries alleged above. That might be because, as Appellants conceded at oral argument, another official—the Commissioner of WVDCR—actually "carries out the day-to-day operations" of these facilities. (Oral Arg. Tr. at 3:01–04). Appellants have not clearly alleged facts that demonstrate that it is the Governor, and not the Commissioner of WVDCR (or some other official), who caused Appellants' injuries.[2]

Appellants raise two arguments resisting this conclusion. First, Appellants assert that their constitutional deprivations are sufficiently and causally connected to the Governor under this court's decision in *South Carolina Wildlife Federation v. Limehouse*, 549 F.3d 324 (4th Cir. 2008). Op. Br. at 19. They contend that in *Limehouse*, the court undertook a "multifactor[] analysis" and determined that the suit was proper against the Director of the South Carolina Department of Transportation based on a sufficient causal connection. *Id.* They urge the court do the same here. Appellants maintain that "Governor Justice has been deeply involved in the correctional system," and "has demonstrated that

---

[2] Appellants claim that they decided against including the Commissioner as a Defendant because testimony by a former Commissioner indicated she too has struggled to make meaningful reforms. *See* Op. Br. at 12 (justifying the Commissioner's omission as a Defendant because "the law does not require the doing of a useless thing"). In other words, Appellants decided not to add the Commissioner to this lawsuit because they assumed it would have been futile. But there is no futility exception to "the irreducible constitutional minimum of standing." *Lujan*, 504 U.S. at 560.

13

he has a direct connection" with, and can effectuate future change in, those institutions. *Id.* In other words, Appellants ask the court to find some level of causation exists between the Governor and the challenged conditions, such that traceability is satisfied.

Appellants' reliance on *Limehouse* is misplaced. True, in that case, the court did find that the Director could be sued under *Ex parte Young* because he had a "special relation" to compliance with a federal law. 549 F.3d at 333–34. But that "special relation" existed precisely because the Director did not only have supervisory authority over the Department. Instead, the Director was responsible for implementing policies, applying for permits, and overseeing projects directly. *See id.* The Governor occupies a very different role. He does not allocate staff, set scheduling shifts, perform or direct maintenance, supervise the cooking of food or provision of supplies, or determine how showers are run in the facilities. Accordingly, there does not exist a sufficient causal connection in this case to establish traceability. *Cf. id.*

Second, Appellants argue that traceability is satisfied because the Governor was presented with budget proposals that included increased funding for facilities from officials like the Commissioner, yet did not act on them. Reply Br. at 1. This argument similarly fails because, once again, the Governor has no role in maintaining the facilities at issue. Instead, as Appellants themselves noted in their complaint, the Governor possesses general oversight duties. *See* J.A. 18 ("Governor Justice is responsible for submitting a proposed budget for each fiscal year to the legislature for consideration pursuant to W. Va. Const. art. VI, § 51, as well as overseeing and carrying out various executive functions including, *inter alia*, corrections." (italics omitted)). That type of "[g]eneral authority to enforce the

14

laws of the state is not sufficient to make government officials the proper parties to litigation challenging the law." *Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316, 331 (4th Cir. 2001) (quoting *Children's Healthcare is a Legal Duty, Inc. v. Deters*, 92 F.3d 1412, 1416 (6th Cir. 1996)). Moreover, the Governor's role in the budget process is limited—he is required to simply propose a budget for legislature approval. The Governor's consideration of various proposals to submit to the legislature was not the cause of Appellants' injuries.[3]

2.

Appellants ask the court for an order restricting the Governor from taking certain actions and forcing him to take others. Because the court is largely "powerless to provide the very relief" requested, the court finds that Appellants' injuries are not redressable. *Shipman*, 716 F.3d at 117.

In determining whether the court "has the power to grant [the] requested relief," *Buscemi v. Bell*, 964 F.3d 252, 259 (4th Cir. 2020), the court first reviews the relief requested. Appellants ask the court to enjoin the Governor from engaging in certain practices within the facilities, as well as to compel him to take certain actions to aid the facilities and allocate state funds to do so. J.A. 40–42. Appellants, however, have not cited any provisions of West Virginia law that give the Governor sufficient direct supervisory

---

[3] Appellants briefly counter that because they wish to vindicate their rights under the Eighth Amendment, the typical standing analysis should not apply. *See* Op. Br. at 13–14. But they provide no support for how or why this analysis should depart from the traditional analysis of Article III standing.

15

authority over the conditions of confinement in the facilities. Nor have Appellants provided any support for the notion that the Governor may make the type of appropriations they seek without the legislature's approval.

As Appellants note in their complaint, West Virginia law requires the Governor to submit a proposed budget for the next fiscal year. J.A. 18 (citing W. Va. Const. art. VI, § 51). But Appellants have not clearly alleged facts to show it is possible for the court to compel the Governor to actually make the appropriations they wish to see. Nor have they clearly alleged facts which show that the Governor may implement and enforce policies, procedures, and practices, or make repairs, personnel changes, and financial investments for the facilities at issue.

Instead, as alleged in the complaint, it is WVDCR and its relevant officials who are "vested with executive authority and responsibility for the administration, operation, and control of all WVDCR facilities and employees of WVDCR facilities." J.A. 19. WVDCR's "duties include establishing, monitoring, and enforcing policy directives and procedures that ensure constitutional confinement and treatment of all individuals in the custody of the WVDCR." *Id.* (citing W. Va. Code § 15A-3-4; W. Va. Code § 15A-3-12). The complaint's citation to West Virginia Code § 15A-3-4 is particularly instructive. That statute lists nearly two dozen powers and duties of the Commissioner, some of which appear closely related to the relief Appellants seek. The record reflects that fact as well. The Commissioner is the final step in the grievance process within West Virginia correctional facilities, meaning that inmate complaints akin to those Appellants allege are routinely appealed for the Commissioner's review. *See* J.A. 120, 125–26.

16

Appellants make three arguments as to why redressability may exist with respect to the Governor.  First, Appellants argue that the Governor's pardon power supports redressability as it could be used to alleviate overcrowding.  The Constitution of West Virginia provides that the Governor "shall have power . . . to grant reprieves and pardons after conviction" provided that he "communicate to the Legislature at each session the particulars of every . . . reprieve or pardon granted, with his reasons therefor."  W. Va. Const. Art. VII, § 11.  But that power is discretionary and federal courts have no ability to control an Executive's decision in this arena.  *See Conn. Bd. of Pardons v. Dumschat*, 452 U.S. 458, 464 (1981) ("[P]ardon and commutation decisions have not traditionally been the business of courts . . . ."); *cf. Yelvington v. Presidential Pardon & Parole Att'ys*, 211 F.2d 642, 643–44 (D.C. Cir. 1954) (noting that the pardon power is "expressly vest[ed] in the President," and that "[i]t should . . . be free of judicial control").

As they did before the lower court, Appellants continue to lean on a Supreme Court of Appeals of West Virginia case, *State ex rel. Dodrill v. Scott*, to support the proposition that their injuries are redressable through the pardon power.  For support, they point to one sentence from *Dodrill* stating, "to bring our overcrowded prisons into constitutional compliance, the Governor may pardon, parole, transfer, or otherwise make constitutional accommodations for those convicts already incarcerated."  352 S.E. 2d 741, 745 (W. Va. 1986).  Appellants construe this to mean that the Governor "has the power to release inmates to bring the correctional system into constitutional compliance."  Op. Br. at 20.

*Dodrill*, however, is largely a state separation-of-powers case.  It does little to show that Appellants' injuries are redressable through the pardon power, let alone that a federal

17

court may order such relief. *Dodrill* focuses on the conflict between a series of Executive Orders and West Virginia state statutes. The Governor of West Virginia at the time—Arch A. Moore, Jr.—implemented Executive Order No. 11-86, directing the Commissioner "to accept no further inmates into his custody until such time as the Governor and the Commissioner determined that the conditions at each institution were appropriate and warranted the acceptance of additional inmates." *Dodrill*, 352 S.E.2d at 743. Executive Order No. 14-86 then superseded 11-86 and directed the Department of Corrections to accept prisoners to certain facilities on a priority basis. *Id.* at 743–44. Importantly, however, Executive Order 14-86 "d[id] not allow the West Virginia Department of Corrections to accept for custody all inmates duly sentenced to confinement in a state penal facility" and, in fact, established maximum-capacity limits for prison populations at certain correctional centers. *Id.* at 744. But those Executive Orders conflicted with West Virginia's statutes that prescribe penalties to be imposed for criminal offenses. *Id.* Those statutes, in general, provided that prisoners *shall* be imprisoned in facilities provided by the State, and this mandatory language for accepting prisoners conflicted with the effect of the Executive Orders. *Id.* at 744–45. With that context, the court concluded the first section of the opinion with this paragraph:

> Our statutory scheme thus not only contemplates, but mandates, a system in which convicts sentenced to the penitentiary are received by the Department of Corrections and incarcerated in a State penal facility. As a result of the current condition of our state prisons, obedience to this statutory scheme leads inexorably to unconstitutional overcrowding. The safety valve on the system, however, is the Governor's power of reprieve, pardon and parole set forth in W.Va. Const. art. 7, § 11 and W.Va. Code 5–1–16 [1923]. Convicts must be accepted by the State for incarceration; but to bring our overcrowded prisons into constitutional compliance, the Governor may pardon, parole,

18

> transfer, or otherwise make constitutional accommodations for those convicts already incarcerated. This leads to socially undesirable consequences. Nevertheless, until the legislature either amends the statutory scheme of sentencing and commitment or appropriates the funds necessary to provide constitutional accommodations for all incarcerated convicts, it is the only permissible course of action open to the Governor.

*Id.* at 745. *Dodrill* does not discuss a judicial order's ability to force the Governor's hand in making pardon decisions as a possible remedy. Instead, it discusses a *non-mandatory* and "permissible course of action open to the Governor." *Id.* This language confirms that the Governor possesses discretionary authority to issue pardons as outlined by the West Virginia Constitution. But it does not go as far as Appellants suggest. Simply put, courts cannot *force* the Governor to issue pardons.

Appellants counter by arguing that the court need not order the Governor to exercise his discretionary power, but instead order relief generally that "overcrowding be eliminated leaving the state officials to determine, in their discretion, the methods used." Op. Br. at 18. In other words, Appellants assert the court should threaten the release of prisoners as an "available 'stick' to encourage the use of [the Governor's] discretionary powers." *Id.* But nowhere in Appellants' complaint do they request that the court order, or threaten to order, the release of prisoners. So, the court will not consider this additional request for relief.

Second, Appellants argue that the Governor's ability to control discretionary funds—like those provided by the federal Coronavirus Aid, Relief, and Economic Security ("CARES") Act—means that he could remedy the issues alleged in the complaint. *Id.* at 23. While the complaint did "not specifically reference the CARES Act," *id.*, Appellants

19

argue that "if $28 million of CARES Act funding was in the Governor's Discretionary Fund, then some or all of that money could have been spent on correcting the locks or any other unconstitutional violation" because the Governor "was free to spend the money as he wanted," *id.* at 24.

Appellants essentially ask the court to force the Governor to spend some of the money that may or may not be in the "Governor's Discretionary Fund." The court cannot accommodate this request for several reasons. First, the CARES Act is mentioned nowhere in Appellants' complaint, which the district court recognized. Second, it remains speculative how much CARES Act money is in the fund at this time. Finally, Appellants do not clearly allege facts demonstrating how an order forcing the Governor to spend CARES Act money in that fund would actually remedy their injuries.

Lastly, Appellants make a series of comparisons to previous cases to support standing. In one case, *Jonathan R. ex rel. Dixon v. Justice*, 41 F.4th 316, 320 (4th Cir. 2022), the Governor was named (and remained) in a suit involving West Virginia's foster care system. This, according to Appellants, shows that the Governor is a proper party in the instant case.[4] Inversely, Appellants claim that the legislature is most often *not* a party to similar actions. Appellants point to an Eastern District of Louisiana case, *Jones v. Gusman*, 296 F.R.D. 416, 423, 430 (E.D. La. 2013), where the court approved a consent

---

[4] Recently, however, following remand of the case from this court, the district court dismissed the complaint against the Governor and other West Virginia officials for lack of standing. *Jonathan R. v. Morrisey*, No. 3:19-CV-00710, 2025 WL 655811, at *1 (S.D.W. Va. Feb. 28, 2025).

decree involving conditions of confinement in which the state legislature was not a party. Appellants gesture towards these cases to show that it is permissible to include the Governor, and exclude the legislature, in their suit.

Critically, however, neither case Appellants cite addressed Article III standing. Accordingly, they cannot rely on them as authority for the proposition they submit. *See Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 144 (2011) ("When a potential jurisdictional defect is neither noted nor discussed in a federal decision, the decision does not stand for the proposition that no defect existed."). It does not matter that in some cases the governor of a state was included in the suit, and in other cases, the legislature was excluded, if standing was never discussed or analyzed. Accordingly, the court rejects Appellants' final argument.

## C.

## 1.

Appellants' injuries are not traceable to the action of the Secretary. Here, too, Appellants cannot rely on the Secretary's general duty to "provid[e] support, oversight, and guidance" to the WVDCR. J.A. 18. Like the Governor, the Secretary lacks both the appropriation power and the statutory authority to enact policies and procedures for the facilities under West Virginia law.

It is clear, then, that Appellants' injuries are "caused by . . . independent actions of third parties not before the court." *Friends for Ferrell Parkway*, 282 F.3d at 320. Without appropriation or enforcement power, it is difficult to see how the Secretary could be causally connected to the Appellants' injuries. Additionally, because Appellants have not

clearly alleged facts which show that the Secretary's actions had a "determinative or coercive effect upon the action of someone else," they have failed to sufficiently plead the causation element. *Bennett*, 520 U.S. at 169.

2.

Appellants seek injunctive relief against the Secretary in the form of appropriations and the enactment of policies. But it is clear that the Secretary can provide neither.

For one thing, the Secretary has no role in the appropriations process, beyond "[f]ormulat[ing] comprehensive budgets for consideration by the Governor." W. Va. Code § 5F-2-2(a)(7). While the Secretary concedes that he maintains the authority to "'[e]nter into contracts or agreements requiring the expenditure of public funds and authorize the expenditure or obligation of public funds as authorized by law,' such authority necessarily requires legislative approval." Resp. Br. at 29 (quoting W. Va. Code § 5F-2-2(a)(8); citing W. Va. Code § 15A-1-9(e)(1)). Because any action the Secretary takes towards appropriations necessarily requires legislative approval, Appellants cannot establish redressability.

For another, it is the Commissioner, not the Secretary, who has authority to enact policies at facilities. Indeed, the Commissioner not only "[e]xercise[s] general supervision over the administration of the institutions under the jurisdiction of the division," but is also given statutory authority to "[e]stablish rules, policies, and regulations in writing governing all subdivisions and institutions within the division," and "[s]upervise the treatment, custody, and discipline of all inmates and residents and the maintenance of the institutions and their industries." W. Va. Code § 15A-3-4(a)(1)), (3), (8)).

22

Appellants advance two arguments to the contrary. First, Appellants claim that the Secretary "has the authority to '[p]rovide for workshops, training programs, and other educational programs . . . necessary to ensure adequate standards of public service in the department.'" Reply Br. at 5 (quoting W. Va. Code § 15A-1-9(e)(5)). According to Appellants, the Secretary could put on programming for correctional officers so they "could be educated on better methods of addressing prison violence." *Id.* While Appellants have identified a statutory duty for the Secretary to provide for workshops, training programs, and educational programs, none of those was included in the various relief Appellants requested. *See* J.A. 40–42.

Second, Appellants point to language in an earlier Executive Order which states that the Secretary had previously "worked to solve the problem of understaffing in the correctional system." Reply Br. at 5. Although a previous Executive Order mentions the Secretary as having worked to solve the problem of understaffing, that is not enough to clearly allege facts supporting redressability. That's because a state official's general duty to enforce the laws, even if that official publicly endorses a measure, is not enough to support standing. *See Waste Mgmt. Holdings, Inc.*, 252 F.3d at 331.

## D.

Much of Appellants' requested relief encourages federal courts to step outside of their role to intervene in policy making and budget allocations. But that is not something federal courts may do. In terms of forcing specific policies to be enacted, federal courts possess "neither the expertise nor the prerogative to make policy judgments" which are generally entrusted to elected officials "who can be thrown out of office if the people

23

disagree with them." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 538 (2012). And in terms of budget allocations, "[w]hen a federal court orders that money be appropriated for one program, the effect is often to take funds away from other important programs." *Horne v. Flores*, 557 U.S. 433, 448 (2009).

This court is reminded that "policy disagreements should be addressed to elected policymakers at the ballot box, not to unelected judges in the courthouse." *John & Jane Parents 1*, 78 F.4th at 626. In this way, Appellants are not without recourse. They may organize, lobby, and attempt to influence policymakers in West Virginia and raise public consciousness of these important issues. They may seek to persuade the Governor to propose a budget with their requested reforms and press the state legislature to enact it. They may even urge the Commissioner to take specific actions to address their complaints. But they may not seek redress in federal courts without Article III standing.[5]

### III.

Because Appellants have failed to make sufficient factual allegations to support the traceability and redressability elements of Article III standing, we affirm the judgment of the district court.

*AFFIRMED*

---

[5] Because the court affirms the district court's dismissal on the basis of standing, it does not address any of the alternative grounds for affirmance asserted by Appellees.